· COMMONWEALTH *vs.* LAWRENCE J. GRINKLEY.

No. 96-P-1131.

Middlesex. May 28, 1997. - December 16, 1997.

Present: BROWN, SMITH, & LAURENCE, JJ.

*Search and Seizure,* Threshold police inquiry. *Constitutional Law,* Search and seizure, Stop and frisk.

A District Court judge erred in concluding that nonspecific and general information, to the effect that a group of black youths had a gun in a public playground, supplied to police telephonically by a named, but not verified, informant who was not demonstrated to be reliable, formed a basis for a reasonable suspicion of criminal activity and further erred in concluding that police observations provided sufficient corroboration to constitute an adequate basis for a reasonable suspicion that any of the youths, singly or together, had committed, was committing, or was about to commit a crime: police were without authority to effectuate a stop of one of the youths or to conduct a pat-frisk of his person and the fruits of the search, vials of crack cocaine, should have been suppressed. [68-75]

COMPLAINT received and sworn to in the Framingham Division of the District Court Department on July 14, 1995.

A pretrial motion to suppress evidence was heard by *Vito A. Virzi,* J., and the case was heard by *Paul F. Healy, Jr.,* J.

*Eric J. Weinstein* for the defendant.

*Ann T. McGonigle,* Assistant District Attorney, for the Commonwealth.

LAURENCE, J. Responding to a telephone report about black youths with a gun in a public playground, investigating Framingham police officers stopped and pat-frisked the defendant, Lawrence J. Grinkley. The frisk produced no gun but did find two prescription bottles in Grinkley's pants pocket that contained twenty-eight bags of crack cocaine. A jury convicted Grinkley of possession of a class B substance with intent to distribute (G. L. c. 94C, § 32A[*a*]) and related offenses. He argues on appeal that a judge erroneously denied his motion to

suppress the seized cocaine because the Commonwealth failed to establish that the police stop was based upon reasonable suspicion to believe that he had committed, was committing, or was about to commit a crime. He also complains that the police exceeded the reasonable scope of a permissible limited search. We agree with Grinkley's challenge to the stop and reverse the judgments of conviction.

The facts on which the motion judge ruled were presented through the testimony of the sole witness at the suppression hearing, Framingham police Sergeant Kevin Slattery. At approximately 8:20 P.M. on July 13, 1995, Slattery received word from the police dispatcher

> "that a woman, whose name was given, was calling stating that she had seen a gun down at the Mary Dennison Field, on Beaver Street. That there was a group of black youths, and Hispanic youths there. That the group of black youths were by the tennis courts, and that they had a gun. And that she thought there was going to be a fight."

Several officers were sent to the area to investigate, and Slattery went independently "to assist." The Mary Dennison Field is a large, public recreational facility that contains playgrounds, tennis courts, lighted basketball courts (which are "quite a distance away" from the tennis courts), and softball diamonds. It is a popular summer "hangout" for youths in a neighborhood that is racially and ethnically mixed but is not (at least was not so described by Slattery) a high-crime area. Slattery parked his police vehicle in a funeral home parking lot at the rear of the field opposite the Beaver Street side so as to be in a position to intercept "anybody [who] came running."

As he watched from his location, he noticed a group of Hispanic youths gathered at the distant basketball courts. He also saw several officers approach a group of black youths who were by the tennis courts.[1] As the officers approached, the group "suddenly broke up . . . [a]nd they started walking toward the wood[s]" at the edge of the field. Slattery thought that they were walking "quickly" but conceded that they "weren't running." He heard his fellow officers begin "shouting, and . . .

---

[1]Slattery did not specify the number of officers involved in the investigation or the number of black youths during the suppression hearing. At trial he testified that there were three officers besides himself and seven or eight youths.

waving the kids back to where they . . . had been." Some of the youths entered the woods but then reemerged to join the others, who had stopped and returned in response to the police shouting and waving.[2] Slattery then left his position in the parking lot and walked by the two groups into that part of the woods where he had seen some of the youths go, in order to determine whether they had "dumped the gun" there. Finding no gun, he went back to make sure things were under control and to assist the other officers in "pat[ting] the group down."

Only then did Slattery notice Grinkley, as he was being questioned by another officer. Slattery recalled that he had previously arrested Grinkley for assault and battery with a dangerous weapon (a knife), an arrest that resulted in Grinkley's conviction. Slattery also recognized another of the youths as someone whom he had arrested, and who was subsequently convicted, for armed robbery with a handgun. Slattery heard Grinkley give the inquiring officer a name Slattery knew to be false. When Slattery challenged Grinkley's response, Grinkley persisted in his refusal to admit his real name. At that point Slattery, concerned that the reported gun had not been discovered, "went to pat him down."[3] Grinkley resisted the pat, pulling back twice and guarding his right pocket area with his hand, despite Slattery's order to keep his hands in the air. Pushing Grinkley's hand away, Slattery succeeded in putting his hand on the pocket and felt a hard, round, cylindrical object that he thought could be a weapon. Slattery then pulled out of the pocket two plastic, "orange, semi-transparent" prescription bottles, one on top of the other, that contained labels for ibuprofen tablets bearing Grinkley's name.

As Slattery "started looking . . . at the bottles more carefully," Grinkley denied that they were his. Slattery immediately realized that what he had found was not a weapon or a danger to the officers. Holding the bottles in front of him and spinning them around, he saw that they contained small glassine bags with a white substance in them as well as tablets. Based on his

---

[2]Slattery's testimony is incomplete and unclear regarding the precise manner in which the police caught up to the youths. The Commonwealth's brief states that the officers had, by their conduct, "ordered [the youths] back to where the officers were standing."

[3]The other officers had already patted or were in the process of patting down the other youths at this moment. No gun had up to that time been discovered on any of the youths. Grinkley was the last or one of the last to be patted down. No weapon of any kind was uncovered by the frisks.

previous experience as a narcotics investigator, Slattery recognized this as a common form of packaging crack cocaine for street level sales and opened the bottles. Grinkley suddenly started running toward the woods but was apprehended and arrested after a struggle.[4]

Based upon Slattery's essentially uncontested testimony, the motion judge concluded that the incriminating drugs had been obtained as the result of a valid investigative stop and frisk. That conclusion did not, however, find evidentiary support in Slattery's testimony or the reasonable inferences therefrom.[5] The judge erred most critically in ruling that the informant's tip constituted a sufficient basis for reasonable suspicion to stop the defendant, in finding that Slattery had "corroborate[d] much of the informant's information" at the scene,.and in finding that the stop of Grinkley was justified because Slattery recognized Grinkley and another youth.[6]

In "stop and frisk" cases, the primary inquiry is whether a

___

[4]The prescription bottles contained twenty-eight "dollar bags" of crack cocaine.

[5]Although the findings of the judge who heard the motion to suppress are binding in the absence of clear error — a very limited standard of review — and the judge's conclusions of law based thereon are entitled to respect, because the issue presented is one of constitutional dimensions those findings (at least those not based upon credibility assessments) and rulings of law are open for reexamination by an appellate tribunal. See *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 743 (1990); *Commonwealth* v. *Thinh Van Cao*, 419 Mass. 383, 384, cert. denied, 515 U.S. 1146 (1995).

[6]The judge had summarily denied the motion to suppress on the date of the hearing without making findings, oral or written. At the request of this court, written findings were prepared by the motion judge. The pertinent erroneous findings behind the judge's ruling were as follows: "As he [Slattery] approached he saw a few other officers approach the group of black youths who then ran toward the woods. He followed them and recognized the defendant and another youth as individuals previously arrested by him and convicted of assault and battery with a dangerous weapon and armed robbery with a handgun, respectively. When they stopped running, he heard one of the officers ask the defendant his name, to which he responded with a name which Sgt. Slattery knew to be false. He [Slattery] challenged the defendant's response but the defendant refused to admit his true name. At this point the other officers had pat frisked the other youths and had not found any gun . . . . At that point he was reasonably justified in fearing for his safety . . . [and in] deci[ding] to pat frisk the defendant for weapons out of concern for his safety." Aside from the minor embellishments that went beyond Slattery's testimony (he conceded that the youths did not "run" away and never mentioned that he feared for his safety), these findings most significantly overlooked the police show of authority that effected the stop, ignored the fact

police officer may make the stop because he has "reason to suspect that a person has committed, is committing, or is about to commit a crime." *Commonwealth* v. *Silva*, 366 Mass. 402, 405 (1974), citing *Terry* v. *Ohio*, 392 U.S. 1 (1968). The reasonableness of the officer's suspicion depends upon the existence of "specific and articulable facts and the specific reasonable inferences which follow from such facts in light of the officer's experience. A mere 'hunch' is not enough. Simple good faith on the part of the officer is not enough. The test is an objective one," *id.* at 406, "view[ing] the circumstances as a whole." *Commonwealth* v. *Stoute*, 422 Mass. 782, 790 (1996).[7]

When police suspicion arises not from officers' own observations but from an informant's tip, as here, the Commonwealth has· the burden of establishing both the informant's reliability and the basis of her knowledge, although police corroboration may make up for deficiencies in one or both of those factors. *Commonwealth* v. *Lyons*, 409 Mass. 16, 19 (1990).[8] The motion judge determined that the tip here satisfied those requirements because it came "from a named informant who gives a detailed description of two groups of youths at a specific location (tennis court) within a park, a specific time and the fact that one of them had a gun." The judge's conclusion that the tipster's basis of knowledge was established by her recitation of "specific details" is questionable on this record.

It might be inferred that the tipster had, as she asserted, personally observed the matters she recounted, and that there was a need for the police to act quickly because of the perceived threat to public safety. Those inferences might justify brevity and a lesser degree of detail. See *Commonwealth* v. *Anderson*, 366 Mass. 394, 399 (1974). Nevertheless, the information supplied here as to the individuals involved was neither specific

that the frisks had already commenced when Slattery began interacting with Grinkley, and misstated the sequence of events, the suspicious observations having come only after the otherwise unjustified stop.

[7]Because we conclude that the stop and threshold inquiry did not satisfy those standards, we do not reach the second part of the two-part analysis in "stop and frisk" situations: whether the scope of the frisk, or the degree of its intrusiveness, was reasonable in the circumstances. See *Commonwealth* v. *Silva*, 366 Mass. at 405; *Commonwealth* v. *Berment*, 39 Mass. App. Ct. 522, 526 n.6 (1995).

[8]Because the standard for investigatory stops is reasonable suspicion rather than probable cause, "a less rigorous showing in each of these areas is permissible." *Commonwealth* v. *Lyons, supra.*

nor detailed. Other than the report of a gun (which we discuss below), the tip was merely generally descriptive of race, ethnic identity, and location in a public place normally frequented by youths — all obvious, nonincriminating facts that would be easily observable to any bystander. Such data do not bespeak the kind of "inside information" that provides a legitimate inference of personal knowledge. See *Commonwealth* v. *Lyons*, 409 Mass. at 20-21 & n.5. Unparticularized racial descriptions, devoid of distinctive or individualized physical details — even were they of a certain person and not, as here, of an entire group — cannot by themselves provide police with adequate justification for stopping an individual member of the identified race who happens to be in the general area described by the informant. See *Commonwealth* v. *Spence*, 403 Mass. 179, 181 (1988); *Commonwealth* v. *Cheek*, 413 Mass. 492, 495-496 (1992). Contrast *Commonwealth* v. *Cast*, 407 Mass. 891, 896-897 (1990) (unnamed informant's basis of personal knowledge shown by the facts that he "named the defendant, described his appearance, gave his phone number, knew of his national origin and citizenship status, how he had obtained that status as a result of marriage to a Massachusetts native, and described the anglicization of his name, his pickup truck, and his employment situation . . . [and his use of] luxury automobiles and expensive hotels in conducting his business . . . [which] level of detail [reflected] . . . 'direct knowledge . . . based on personal observation and contacts which went materially beyond "a casual rumor . . . or [knowledge of] . . . an individual's general reputation" ' "); *Commonwealth* v. *Fleming*, 37 Mass. App. Ct. 927, 928 (1994).

Nonetheless, despite the fact that what the tipster described "did not reveal any special familiarity . . . that might substitute for explicit information about the basis of the caller's knowledge," *Commonwealth* v. *Lyons*, 409 Mass. at 20-22, we will accept the adequacy of the informant's basis of knowledge on the authority of *Commonwealth* v. *Alvarado*, 423 Mass. 266, 271 (1996) (anonymous telephone caller's statement that he or she had seen several "Hispanic subjects" in a blue car in the driveway of 138 Jackson Street and a handgun wrapped in a towel in the vehicle permitted inference of recent firsthand observation). As in *Alvarado*, the more difficult question is whether the police had an adequate basis for concluding that the informant was reliable.

As just discussed, the tip did not contain the qualitative or quantitative detail that stamps it with an important indicium of reliability. See *Commonwealth* v. *Va Meng Joe*, 40 Mass. App. Ct. 499, 505-506 (1996), and cases cited, *S.C.*, 425 Mass. 99, 103-104 (1997). Cf. *Commonwealth* v. *Rojas*, 403 Mass. 483, 487 (1988). Contrast *United States* v. *McClinnhan*, 660 F.2d 500 (D.C. Cir. 1981); *United States* v. *Clipper*, 973 F.2d 944 (D.C. Cir. 1992), cert. denied, 506 U.S. 1070 (1993); *United States* v. *Gibson*, 64 F.3d 617 (11th Cir. 1995), cert. denied, 517 U.S. 1173 (1996) (tips about guns all described a certain individual with particularity as possessing the gun). The Commonwealth argues that the informant's having provided police with her name and address sufficiently bolstered her reliability. It is true that our cases have stated that when information is reported to the police by "a named and identified person" rather than a "faceless informer," *Commonwealth* v. *Atchue*, 393 Mass. 343, 347 (1984); or by an identified "private citizen" or "ordinary citizen," *Commonwealth* v. *Burt*, 393 Mass. 703, 710 (1985); or by a named "concerned citizen[]" calling out of .civic duty, *Commonwealth* v. *Rojas*, 403 Mass. at 488, "[t]he strict requirements of reliability which govern an analysis of an anonymous informant's trustworthiness are relaxed . . . ." *Commonwealth* v. *Freiburg*, 405 Mass. 282, 297, cert. denied, 493 U.S. 940 (1989).

Nonetheless, the cases cited by the Commonwealth in support of a relaxed standard of reliability involved individuals personally known to the police, most of them past reliable informants, and not, as here, a person previously unknown to and never actually met by the police. Compare *Commonwealth* v. *Ciaramitaro*, 26 Mass. App. Ct. 110, 114-115 (1988); *Commonwealth* v. *Va Meng Joe*, 40 Mass. App. Ct. at 500. Furthermore, other cases holding that the reliability of a tip from a private citizen is substantially strengthened when the citizen is identified by name and address are also distinguishable from the present situation. Compare *Commonwealth* v. *Atchue*, 393 Mass. at 344-349 (informant, identified by name, address, and date of birth, gave detailed description of specific stolen items and their exact location); *Commonwealth* v. *Grzembski*, 393 Mass. 516, 520-521 (1984) (citizen provided police with a detailed written and signed statement); *Commonwealth* v. *Burt*, 393 Mass. at 707-710 (person informing police of criminal activity was a municipal officer identified by name and address and did so in a face-to-face encounter with

the police); *Commonwealth* v. *Freiberg*, 405 Mass. at 296 n.7, 298 (informant was not only named and identified but described the criminal activity and its perpetrator in great detail and personally assisted the police at the scene of the crime); *Commonwealth* v. *Bakoian*, 412 Mass. 295, 297, 301 (1992) (identified informant was previously known to police as a source of credible information and provided specific details to the defendants' exact identities, destination, and time of arrival); *Commonwealth* v. *Stoute*, 422 Mass. at 783-784, 790-791 (tip that defendant had a gun came from a bystander who spoke face-to-face with the police in a high crime area and "who could have been identified"). See generally 2 LaFave, Search and Seizure § 3.4(a), at 219-220 (3d ed. 1996) ("It does not follow . . . that if the name of the person providing the information *is* disclosed, then he is by virtue of that fact alone properly characterized as a citizen-informer entitled to the presumption of reliability. . . .' [That] is one factor which may be weighed in determining [reliability]").

Unlike those cases, the informant's stated identity here could not be verified because she did not leave a telephone number and presumably could not be contacted by the police. See *Commonwealth* v. *Melendez*, 407 Mass. 53, 58 n.4 (1990). Contrast *Commonwealth* v. *Cast*, 407 Mass. at 898; *Commonwealth* v. *Va Meng Joe*, 425 Mass. at 103-104. Her inaccessibility (and resultant unaccountability for providing false information, see G. L. c. 269, § 13A) made this informant barely distinguishable from an anonymous tipster. Analogous to the concern raised in *Commonwealth* v. *Lyons*, that "[a]nyone can telephone the police for any reason," 409 Mass. at 21, is the reality that anyone can claim over the telephone to be a particular individual with impunity if that claim cannot be verified. Contrast also *Commonwealth* v. *Johnson*, 36 Mass. App. Ct. 336 (1994) (individual who reported to the police that the defendant was carrying a handgun in her purse was "a neighborhood person[9] known to" the patrolling police officer); *Commonwealth* v. *Vasquez*, 426

---

[9]The informant here did not claim to be and in all probability was not "a neighborhood person," since the street given as her address does not exist near Mary Dennison Field, or, indeed, anywhere in Framingham. See *Commonwealth* v. *Boston & Me. Transp. Co.*, 282 Mass. 345, 350 (1933); *Commonwealth* v. *Sargent*, 330 Mass. 690, 693 (1953); *Nantucket* v. *Beinecke*, 379 Mass. 345, 352 (1979); *Matter of McInerney*, 389 Mass. 528, 536 (1983); Proposed Mass.R.Evid. 201(b); Hughes, Evidence §§ 71-72, 74 (1961 & Supp. 1993) (judicial notice can be taken by trial and appellate courts of facts of common knowledge and facts capable of accurate and ready determination,

Mass. 99, 100-103 (1997) (several individuals on a public street approached a police officer, independently informed him that a man brandishing a gun had been chasing another man down the street, and pointed out the alleged assailant to the officer).

Whatever the insufficiencies in an informant's tip, we recognize that "[w]hen a tip . . . concerns the possession of a firearm, it deserves the immediate attention of law enforcement officials." *Commonwealth* v. *Stoute*, 422 Mass. at 790. Nonetheless, such a tip is not, standing alone, a basis for reasonable suspicion of criminal activity, because the mere possession and carrying of a gun is not a crime. *Commonwealth* v. *Couture*, 407 Mass. 178, 181, 183, cert. denied, 498 U.S. 951 (1990) (police had no reason to believe defendant did not have a license to carry firearm); *Commonwealth* v. *Alvarado*, 423 Mass. at 271.[10] Police observations in discharge of that duty of prompt investigation can provide adequate corroboration to "make up for deficiencies in" the informant's reliability. *Commonwealth* v. *Lyons*, 409 Mass. at 19. Corroboration by police of an informant's predictions as to what the police will find, particularly predictive information regarding "nonobvious details" beyond those apparent to a casual bystander, is perhaps of greatest significance in justifying police inquiries in reliance on the tip. *Id.* at 20-21. *Commonwealth* v. *Va Meng Joe*, 40 Mass. App. Ct. at 506-507, and cases cited.

Unlike the cases in which police observations confirm all or most of the nonobvious predictive details of an informant's tip, e.g., *Draper* v. *United States*, 358 U.S. 307, 313 (1959); *Commonwealth* v. *Cast*, 407 Mass. at 897-900; *Commonwealth* v. *Va Meng Joe*, 425 Mass. at 103-104, or confirm facts communicated by a tipster that are suggestive of criminal conduct, e.g., *Commonwealth* v. *Valdez*, 402 Mass. 65, 71 & n.4 (1988);

---

including geographical facts such as street locations, so long as the noticed fact is not an essential element of proof of the crime charged, *Commonwealth* v. *Green*, 408 Mass. 48, 50 [1990]).

[10]Even under the cases just cited, the possession of a firearm by a minor would be presumptively illegal as unlicensed and therefore ground for police investigation. See G. L. c. 140, § 131; G. L. c. 269, § 10. The record does not, however, provide any information regarding the ages of Grinkley and the other black "youths" or suggesting that the prior convictions of Grinkley and one of the other "youths" were as juvenile rather than as adult offenders. We have previously encountered the imprecise usage of the term "youth" in criminal cases. *Commonwealth* v. *Burnett*, 36 Mass. App. Ct. 1, 5, *S.C.*, 418 Mass. 769 (1994) (involving a twenty-six year old defendant).

*Commonwealth* v. *Spano*, 414 Mass. 178, 185 (1993); *Commonwealth* v. *Peguero*, 26 Mass. App. Ct. 912, 913-914 (1988); *Commonwealth* v. *Munera*, 31 Mass. App. Ct. 380, 384 (1991), here there was minimal corroboration. Slattery confirmed only one bit of the informant's message, and that an innocent fact apparent to the most uninformed passerby: a small group of black youths had congregated near the tennis courts in a public park at day's end.

Although Slattery did see a group of Hispanic youths, they were not, as predicted, near the black youths or in a position to engage them physically but rather were "quite a distance away." He discerned no interaction between the two groups, much less a recent, ongoing, or threatened fight, or even apparent tension. Neither Slattery nor any of the police officers espied a gun or other weapon in the possession of the black youths. Thus, the only significant details of the tip — the observation of a gun and the apprehended imminence of a melee — proved unreliable. Nor did Slattery view any strange, furtive, or suspicious behavior on the youths' part that could infuse otherwise innocent activity with incriminating aspect in the discerning eye of an experienced police officer. Contrast *Commonwealth* v. *Cast*, 407 Mass. at 900.[11]

In short, even combined with Slattery's observations at the

---

[11]Contrast also *Commonwealth* v. *Cavanaugh*, 366 Mass. 277, 280, 281 (1974) (upon seeing police, defendant driving the wrong way down a one-way street accelerated his vehicle, leading to a high-speed chase through city streets); *Commonwealth* v. *Anderson*, 366 Mass. at 395-396, 400 (suspect looked back over his shoulder at following uniformed police officers as he walked briskly away, then made a gesture as if attempting to get rid of a bag he was holding); *Commonwealth* v. *Fraser*, 410 Mass. 541, 542, 545 (1991) (as police approached a group of young men pursuant to a tip about a man carrying a gun in a high-crime area, they saw defendant bend down behind a truck as though picking something up and subsequently keeping his hands in his pockets); *Commonwealth* v. *Willis*, 415 Mass. 814, 816 (1993) (man who police teletype said would be carrying a striped pillowcase and a loaded handgun confronted approaching police with the striped pillowcase in one hand and the other hand in his right pocket); *Commonwealth* v. *Va Meng Joe*, 425 Mass. at 105-106, and cases cited (man who tipster said would be coming to doughnut shop to sell drugs to tipster drove slowly by shop as if meeting someone); *Commonwealth* v. *Johnson*, 36 Mass. App. Ct. at 336-337 (woman who neighborhood resident told police was carrying a gun acted in angry, belligerent, and out-of-control manner as police officer approached). Contrast also cases in which a tipster describes a particular individual as possessing a gun and the police observe a person matching that description in the very vicinity where the tipster had said the individual would be. E.g., *United States*

scene, the tip failed to constitute an adequate basis for reasonable suspicion that the group of black youths by the tennis courts, or any one of them, had committed, was committing, or was about to commit a crime. The fact that as police officers approached the group started walking quickly away did not elevate the police officers' inchoate suspicion to the level of reasonableness justifying a stop and frisk, even though a firearm was reportedly involved. See *Commonwealth* v. *Bacon*, 381 Mass. 642, 645-646 (1980) (defendant's concealing his face from police did not create reasonable suspicion); *Commonwealth* v. *Thibeau*, 384 Mass. 762, 763-764 (1981) (defendant on bicycle making sudden turn after noticing marked police cruiser did not constitute basis for reasonable suspicion); *Commonwealth* v. *Mercado*, 422 Mass. 367, 371 (1996) ("Neither evasive behavior, proximity to a crime scene, nor matching a general description is alone sufficient to support the reasonable suspicion necessary to justify a stop and frisk").

Only if other factors are present in addition to arguably evasive behavior, which "in combination may allow the police to narrow the range of suspects to particular individuals," may attempts to avoid contact with the police be considered in the reasonable suspicion calculation. *Commonwealth* v. *Mercado*, *supra*, and cases cited. See *Commonwealth* v. *Harkess*, 35 Mass. App. Ct. 626, 632 (1993). Here, there were no such additional factors. Except for their dispersal at the approach of police officers, nothing about the location, appearance, or conduct of the group of black youths gave rise to reasonable suspicion. The report from an informant of questionable reliability that one of the group of black youths had a gun did not serve to "narrow the range of suspects" to any of the group, much less to Grinkley himself.

More to the point, unlike the "other factors" which the cases just cited allow to be combined for "reasonable suspicion" purposes with apparent efforts to avoid contact with the police, the report of a gun was not an action or condition actually observed by or known to the police. It was not another "fact," contrast *Commonwealth* v. *Mercado*, 422 Mass. at 371, or even a justifiable inference from observed facts, but rather little more than a working hypothesis. Nothing in the situation or in police experience (at least as testified to) provided a reasonable basis

v. *McClinnhan*, 660 F.2d 500; *United States* v. *Clipper*, 973 F.2d 944; *United States* v. *Gibson*, 64 F.3d 617.

for the police to induce the likely existence of a gun at such a scene, or to elevate the tipster's reported but unconfirmed observation of a gun to the status of a suspicious circumstance. To hold otherwise would essentially eliminate the necessity of police corroboration of conclusory reports about guns from tipsters of dubious reliability. It would effectively make the unconfirmed rumor of a gun a self-verifying fact justifying the stop and frisk for the suspected gun.

The cases involving police investigation of reports of a gun or other weapon do not countenance such a conflation: they rather stress the necessity of actual police knowledge and observations, particularly in conjunction with a particular individual's suspicious behavior, in substantiating a tip of less-than-solid veracity. See *Commonwealth* v. *Anderson,* 366 Mass. at 400; *Commonwealth* v. *Couture,* 407 Mass. at 180 & n.2, 183 (even actual police knowledge that a specific individual is carrying a gun does not in and of itself create "probable cause to believe that the [individual] was or had been engaged in any criminal activity. . . . '[S]ome objective manifestation' " is necessary); *Commonwealth* v. *Fraser,* 410 Mass. at 545-546; *Commonwealth* v. *Cheek,* 413 Mass. at 496 ("no suspicious activity of the defendant [was] observed by the police"); *Commonwealth* v. *Willis,* 415 Mass. 814, 815-816, 819 (1993); *Commonwealth* v. *Stoute,* 422 Mass. at 783-784, 790-791; *Commonwealth* v. *Alvarado,* 423 Mass. at 269-273; *Commonwealth* v. *Johnson,* 36 Mass. App. Ct. at 337 (stressing that the situation "objectively [gave] rise to public safety concerns"); *Commonwealth* v. *Berment,* 39 Mass. App. Ct. 522, 523, 527, 529 (1995). Cf. *Commonwealth* v. *Vasquez,* 426 Mass. at 101-102 (reliable identification of defendant by multiple bystander eyewitnesses as the man who had just committed an armed assault on another justified a stop and frisk of defendant as he stood next to an automobile on the passenger's side).

Upholding the validity of a stop and frisk in the instant circumstances would dilute the requirement of using "objective criteria" in determining reasonable suspicion, to the point of increasing "the risk of arbitrary action and abusive practices by police," *Commonwealth* v. *Lyons,* 409 Mass. at 22, and "encourag[ing] unduly intrusive police practices" akin to broad "sweeps" in search of ambiguously identified suspects engaged in no suspicious, much less criminal, activities. *Commonwealth* v. *Cheek,* 413 Mass. at 496-497. Cf. *Commonwealth* v. *Phillips,*

413 Mass. 50, 52-53, 55-56 (1992) (stop and search of black youths in high-crime area on suspicion of gang involvement invalidated).

It is clear that the police stopped Grinkley and his companions, for constitutional purposes — i.e., effected their "seizure" — when the youths submitted to the several police officers' show of authority in advancing on them, shouting and waving at them to stop and return as they walked toward the woods. The youths reacted by doing precisely what the officers had demanded, in a situation in which we are confident no reasonable person would have felt free to leave without responding to the police commands. See *Terry* v. *Ohio*, 392 U.S. at 19 n.16; *United States* v. *Mendenhall*, 446 U.S. 544, 553-554 (1980); *Commonwealth* v. *Thibeau*, 384 Mass. at 763-764; *Commonwealth* v. *Stoute*, 422 Mass. at 788-789; *Commonwealth* v. *Pimentel*, 27 Mass. App. Ct. 557, 560 (1989); *Commonwealth* v. *Berment*, 39 Mass. App. Ct. at 525-526. Contrast *Commonwealth* v. *Thinh Van Cao*, 419 Mass. 383, 387-388 (1995) (police officer approached group in parking lot and asked them for their identities without ordering them to do anything or indicating that they could not terminate the encounter); *Commonwealth* v. *Dowdy*, 36 Mass. App. Ct. 495, 496 (1994) (police officer investigating report of shots casually approached defendant who was walking out of a schoolyard and asked "What's up? Did you hear any shots?").[12]

Prior to that police show of authority in pursuit of the youths, Slattery and his police colleagues had no reasonable suspicion, based upon specific and articulable facts, to stop Grinkley for any past, ongoing, or threatened crime. Slattery's post-stop recognition of Grinkley and one of his companions as individuals he had previously arrested for weapons crimes, his awareness that Grinkley was using an alias, and his failure to find any gun in the woods — observations that would have constituted specific and articulable facts weighing in favor of a finding of reasonable suspicion had they preceded the stop, see *Commonwealth* v. *Silva*, 366 Mass. at 406; *Commonwealth* v. *Crowley*, 29 Mass. App. Ct. 1, 4 (1990); *Commonwealth* v. *Harkess*, 35 Mass. App. Ct. at 632 — cannot retroactively justify a stop

---

[12]The motion judge did not expressly determine when Grinkley was stopped by the police. As noted, the Commonwealth concedes that the youths had stopped and returned in response to the police "order[ing] them back to where the officers were standing."

effected on insufficient facts and lacking reasonable suspicion. See *Commonwealth* v. *Thibeau*, 384 Mass. at 764; *Commonwealth* v. *Wren*, 391 Mass. 705, 708 n.2 (1984); *Commonwealth* v. *O'Laughlin*, 25 Mass. App. Ct. 998, 999-1000 (1988).

Because the tip and subsequent police corroboration did not establish reasonable suspicion to stop Grinkley, his motion to suppress the fruits of the subsequent frisk should have been allowed. Had it been allowed, the Commonwealth's evidence against Grinkley on the drug charges would have been insufficient to support conviction, and his motion for required findings of not guilty would have succeeded. He is now entitled to the entry of such findings. See *Commonwealth* v. *Thibeau*, 384 Mass. at 765.

> *Judgments reversed.*
>
> *Verdicts set aside.*
>
> *Judgments for the defendant.*