COMMONWEALTH *VS.* ALFONSO A.,[1] a juvenile.

No. 99-P-1787.

Suffolk. April 19, 2001. - November 28, 2001.

Present: GELINAS, DREBEN, & COHEN, JJ.

Further appellate review granted, 436 Mass. 1101 (2002).

*Probable Cause. Search and Seizure,* Probable cause, Affidavit. *Constitutional Law,* Probable cause, Waiver of constitutional rights, Parent and child. *Waiver.*

Circumstances set forth in an affidavit of a police officer were insufficient to show that an informant was credible or that information provided by the informant was reliable and, consequently, physical evidence seized by the police should have been suppressed. [280-288]

The record of a hearing on a fifteen year old juvenile's motion to suppress his statements to police did not demonstrate that the police provided the juvenile with an adequate opportunity to consult with an interested adult who was informed of, and understood, the juvenile's constitutional rights, where the juvenile had been detained for two and one-half hours while his mother and other close relatives were available but were not informed of his detention; consequently, the juvenile's waiver of the right to remain silent was invalid and his statements to the police should have been suppressed. [288-294]

COMPLAINTS received and sworn to in the juvenile session of the West Roxbury Division of the District Court Department on April 1, 1999.

A pretrial motion to suppress evidence was heard by *Paul D. Lewis,* J., and, on transfer to the Boston Juvenile Court, a second pretrial motion to suppress evidence was heard by *Leslie E. Harris,* J., and the cases were heard by *Stephen M. Limon,* J.

*Kenneth J. King* for the juvenile.

*Alex Philipson,* Assistant District Attorney, for the Commonwealth.

DREBEN, J. Prior to his jury waived trial, the juvenile filed two

[1]The name is a pseudonym.

motions to suppress: one motion challenged a search pursuant to a warrant during which physical evidence was seized, and the other sought to suppress incriminating statements of the juvenile obtained at the time of the search. Both motions were denied and the juvenile was adjudicated a delinquent on complaints charging him with breaking and entering in the day time, larceny over $250, and possession of a firearm.[2] In his appeal, he claims that (1) the search was invalid as the affidavit in support of the warrant failed to establish probable cause; and (2) the statements should be suppressed because he was not accorded the protections set forth in *Commonwealth* v. *A Juvenile*, 389 Mass. 128 (1983), and hence, his waiver of the right to remain silent was invalid. We agree that both motions to suppress should have been allowed.

1. *Motion to suppress physical evidence.* Where, as here, a search is conducted pursuant to a warrant, probable cause must be found only on the facts revealed on the face of the affidavit and any reasonable inferences therefrom. *Commonwealth* v. *Germain*, 396 Mass. 413, 415 n.4 (1985). *Commonwealth* v. *Allen*, 406 Mass. 575, 578 (1990). See *Commonwealth* v. *Upton*, 394 Mass. 363, 367 (1985). We turn to the affidavit which is set forth in relevant part in the margin.[3] On January 28, 1999, the affiant, an experienced detective with the Boston police department, sought a warrant for the second-floor residence and

---

[2]He was found not delinquent on a complaint charging possession of ammunition. He was committed to the custody of the Department of Youth Services on the possession of a firearm charge. The remaining complaints were placed on file.

[3]"My name is James E. Nugent your affiant. [Nugent's experience is set out but omitted here.]

"This affidavit is made in support of an application for a search for the second floor residence located at 21 Montvale Street, Roslindale, MA the unattached garage next to the house, and the basement of the house which is a common area shared by residents on the first floor. Within the last two hours, I have received information from a source of information whose whereabouts and identity are known to me, and who wishes to remain anonymous. Said source of information shall hereafter be referred to in this affidavit as 'X'. 'X' stated to me that 'X' observed six rifles, three shotguns, two rifles, and one air pellet rifle at the above location. 'X' stated that there are two (2) individuals currently in the house. One individual goes by the name of Ricky (last name unknown), he resides in the house with his parents. The other individual goes by the name of [Alfonso], last name unknown. It is believed that the parents are not home at this time.

other specified areas at 21 Montvale Street, in the Roslindale area of Boston. He had, within the last two hours, received information from an informant, referred to as "X," "whose whereabouts and identity [were] known" to him, but who wished to remain anonymous. X told the affiant that he had "observed six rifles, three shotguns, two rifles, and one air pellet rifle" at the locus, and that there were two people currently in the house, one called Ricky, who lived there with his parents, and the other named Alfonso. Their last names were unknown to the informant and he believed that "the parents" (not identified) were not then at home.

X also told the affiant that Alfonso said "that he took the guns in a Breaking & Entering on the 27th of January, 1999, in West Roxbury." X stated that Ricky was going to put the guns in a black bag and place them in the garage, and that Alfonso "was making several phone calls" to find a buyer. Alfonso was asking three to four hundred dollars for each weapon and had scheduled a meeting with two prospective buyers later in the evening.

The affiant asserted that in fact there had been a breaking and entering at 24 Chestnut Street, in the West Roxbury section of Boston, on January 27, 1999, in which three 12 gauge shotguns, two 20 gauge shotguns, and a pellet gun were taken.

The warrant issued and was executed that evening, at which time numerous guns were found.

Recognizing correctly that Massachusetts adheres to the "two pronged test" of *Aguilar* v. *Texas,* 378 U.S. 108 (1964), and

" 'X' stated that [Alfonso] said 'that he took the guns in a Breaking & Entering on the 27th of January, 1999, in West Roxbury.' On January 27, 1999, there was in fact a breaking and entering at 24 Chestnut Street, West Roxbury, MA in which (3) 12 gauge shotguns, (2) 20 gauge shotguns, and a pellet gun were taken.

" 'X' also stated, that Ricky was going to put the guns in a black bag and put them in the garage for safekeeping. He further stated that [Alfonso] was making several phone calls in order to ascertain a buyer for the weapons. He was asking three to four hundred dollars for each weapon. [Alfonso] scheduled a meeting later this evening with two individuals in hopes of selling the weapons.

"Based upon the information detailed in this affidavit, I have reason to believe, and do believe, that weapons are being illegally stored in and sold from, 21 Montvale Street, Roslindale, MA."

*Spinelli* v. *United States*, 393 U.S. 410 (1969), see *Commonwealth* v. *Upton* (*Upton* I), 390 Mass. 562, 568-571 (1983), rev'd., *Massachusetts* v. *Upton*, 466 U.S. 727 (1984), *S.C.*, *Commonwealth* v. *Upton*, 394 Mass. 363, 374 (1985) (*Upton II*),[4] the motion judge held that both prongs were met. We agree as to the first prong. Not only did X personally observe specific kinds of guns,[5] i.e., rifles, shotguns, and an air pellet gun, see *Commonwealth* v. *Allen*, 406 Mass. 575, 578 (1990) ("First-hand receipt of information through personal observation satisfies the basis of knowledge prong"), but he also heard Alfonso state that he had taken the guns in a breaking and entering on January 27, 1999, in West Roxbury. See *Commonwealth* v. *Lapine*, 410 Mass. 38, 41 (1991) (hearing a conversation satisfies the basis of knowledge prong); *Commonwealth* v. *Crawford*, 410 Mass. 75, 78-79 (1991) (basis of knowledge test satisfied by defendant's telling informant of plan).

The difficulty lies with the veracity test. None of the common bases for determining reliability is present: the affidavit does not mention successful past performance of the informant, or suggest that he or she made a statement against penal interest, or that the informer is "an ordinary citizen" who provided informa-

---

[4]As stated in *Commonwealth* v. *Warren*, 418 Mass. 86, 88-89 (1994):

"The Commonwealth must satisfy a two-pronged standard. Where information from an unidentified informant is relied on to supply probable cause to search, art. 14 of the Massachusetts Declaration of Rights requires that the affidavit apprise the magistrate of (1) some of the underlying circumstances from which the informant concluded that contraband was where he claimed it was (the basis of knowledge test), and (2) some of the underlying circumstances from which the affiant concluded that the informant was credible or the information reliable (the veracity test). *Commonwealth* v. *Upton*, [394 Mass.] at 375, *Commonwealth* v. *Parapar*, 404 Mass. 319, 321 (1989).

"Each prong of the *Upton* standard, the basis of knowledge and the veracity of the informant, must be separately considered and satisfied. *Commonwealth* v. *Upton*, supra at 376. *Commonwealth* v. *Blake*, 413 Mass. 823, 827 (1992). However, police corroboration of an informant's detailed tip can compensate for deficiencies in either or both prongs of the standard, and thus satisfy the art. 14 probable cause requirement. *Commonwealth* v. *Cast*, 407 Mass. 891, 896 (1990)."

[5]That the description of the guns stolen from the home in West Roxbury is slightly different from the informant's description is a minor discrepancy which does not affect our conclusion. See *Commonwealth* v. *Watson*, 430 Mass. 725, 735 n.19 (2000) (mistake in dog's name did not disturb integrity of the affidavit).

tion as a witness to a crime. See *Upton I*, 390 Mass. at 569-570, and cases cited. In reaching his conclusion that the veracity prong had been satisfied, the motion judge relied on the following: (1) X had provided details which included the type and number of guns, where they had been obtained, and the plan for disposing of them; (2) similar guns had been stolen in a breaking and entering, thus "essentially corroborat[ing]" X's information; and, (3) X's reliability was bolstered by the fact that the affiant policeman knew X's identity and whereabouts.

We recognize that "[a]n affidavit for a search warrant . . . 'must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion. . . . [T]he resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.' " *Commonwealth* v. *Germain*, 396 Mass. 413, 418 (1985), quoting from *United States* v. *Ventresca*, 380 U.S. 102, 108-109 (1965).

Nevertheless, in this case, each of the three considerations relied on by the motion judge is weak, and, even in combination, when the affidavit is read as a whole, the reliability of the information remains unsupported.

a. The degree of detail is not impressive; indeed, assuming the affidavit is taken to mean that the informant saw six rather than twelve guns,[6] his claimed observation of "six rifles, three shotguns, two rifles, and one air pellet rifle," while adequate to satisfy the basis of knowledge prong, is not sufficiently accurate or specific to be "self-verifying." See *Commonwealth* v. *Rojas*, 403 Mass. 483, 487 (1988). The informant's description of the guns does not match the detailed description of the items stolen, namely, three 12-gauge shotguns, two 20-gauge shotguns, and a pellet gun. Compare the detailed and corroborated description in *Commonwealth* v. *Germain*, 396 Mass. at 418 (1985).[7] Moreover, here, "the informant did not provide particularized

---

[6] It will be remembered that the affidavit stated X claimed to have observed "six rifles, three shotguns, two rifles, and one air pellet rifle." See n.3, *supra.*

[7] In *Commonwealth* v. *Germain*, 396 Mass. 413, 416 (1985), the police officer's affidavit described the items worn by the robber as follows: "a brown knit hat, a suede mask, brown work gloves, brown waistline vinyl jacket, blue 'jox' tennis shoes with white stripes on the sides"; his gun was described "as a handgun, gray in color with numerous spots of rust on the top of the barrel."

distinguishing characteristics of the . . . apartment, possessions, or activities." *Commonwealth* v. *Rojas*, 403 Mass. at 487. He did not even know the last names of the persons in the apartment.[8]

Moreover, this court has questioned the notion that detail, alone, uncorroborated by police investigation, is an indication of veracity. *Commonwealth* v. *Oliveira*, 35 Mass. App. Ct. 645, 648 (1993). In that case, Justice Kaplan, writing for the court, quoted from *Stanley* v. *State*, 19 Md. App. 507, 533 (1974), with approval: "If the informant were concocting a story out of the whole cloth, he could fabricate in fine detail as easily as with rough brush strokes. Minute detail tells us nothing about 'veracity.' " See Grasso & McEvoy, Suppression Matters Under Massachusetts Law, §§ 10-4(c), 10-5(b) (2001).

In sum, the details that satisfied the basis of knowledge test fell short of bolstering the informant's veracity. See *Upton I*, 390 Mass. at 569.

b. What details there were were not significantly enhanced by police investigation. True, there was here some corroboration. A robbery had taken place on January 27th in West Roxbury and five shotguns and a pellet gun had been stolen. But the circumstances related in the affidavit did not lend credibility to the informant. Where there has been a robbery or other criminal conduct and an informant provides facts which are not publicly known or shows knowledge of criminal behavior before the police are aware of the crime, the likelihood that the information is false is reduced. See 2 LaFave, Search and Seizure § 3.3(f), at 170 (3d ed. 1996) & at 19 (2002 Supp.).

Our cases, and cases elsewhere, accord credibility in such circumstances. Thus, in *Commonwealth* v. *Germain*, 396 Mass.

---

Observed by the informant in the defendant's apartment, in addition to white bank deposit bags containing a large amount of currency, were a "gray-colored handgun with rust stains on the top of the barrel, and a brown suede mask."

[8]Although the informant predicted a meeting with two prospective buyers, the police did not attempt to corroborate that fact or attempt a controlled supervised buy of the guns. Such corroboration would probably have compensated for the deficiency in the veracity prong. See *Commonwealth* v. *Warren*, 418 Mass. 86, 89-91 (1994). See also *Commonwealth* v. *Reyes*, 423 Mass. 568, 572 (1996).

at 415-418, after listing other factors tending to show the reliability of the informant's disclosure about the robbery,[9] the court pointed to the detailed description of the items given by the informant which, police investigation confirmed, matched the detailed description given by the victims. Although the court did not specifically so state, it was most unlikely that knowledge about the items described as observed by the informant, a brown suede mask and a gray-colored handgun with rust spots on the top of the barrel, had been revealed to the public. See note 7, *supra*. See also the following cases where knowledge of unique details corroborated by police investigation supported the informant's credibility. *Yielding* v. *State*, 371 So. 2d 951, 957 (Ala. Cr. App. 1979), cert. denied, *Ex parte Yielding*, 371 So. 2d 962 (Ala. 1979)[10] ; *State* v. *Jeffcoat*, 403 So. 2d 1227, 1229-1230 (La. 1981) (court noted that some items described by the informant, and confirmed by police as having been taken in two different burglaries, were "unusual," e.g., a rug [in fact, a tapestry] showing deer drinking from a stream and an "old time" cap and ball pistol); *State* v. *Ballard*, 836 S.W.2d 560, 562-563 (Tenn. 1992) (unique charm from a bracelet in the shape of a gold outhouse with a little man sitting inside was described by both the informant and the victim); *People* v. *Conwell*, 649 P.2d 1099, 1101 (Colo. 1982), overruled on other grounds by *People* v. *Quintata*, 785 P.2d 934, 937 (Colo. 1990) (court abandoned *Aguilar-Spinelli* test and adopted totality of the circumstances test set forth in *Illinois* v. *Gates*, 462 U.S. 213, 238 [1983]) (informant's description of stolen stereo equipment as Technic, Pioneer and several other brands was confirmed by victim). See *State* v. *Carson*, 320 N.W.2d 432, 434-436 (Minn. 1982) (informant's description of large quantities of pharmaceutical bottles of Dilaudid and Preludin was accorded weight, with other factors, to establish the informant's

---

[9]Police investigation had ascertained that the defendant had been in Worcester where the robbery had been committed, had large amounts of cash, was making large cash purchases, and had a record of similar crimes.

[10]In *Yielding* v. *State*, 371 So. 2d 951, 953-954 (Ala. Cr. App. 1979), the description of items observed by the informant and corroborated by the police as stolen included: 1 Remington 30-30 caliber rifle Teddy Roosevelt Commemorative Model 94 with Silver medallion in the stock; 1 Colt 22 caliber short chrome plated derringer with pearl handles; 4 Jensen TS stereo speakers.

truthfulness). See also cases where the informant had knowledge of a crime before the police did, e.g., *Harrelson* v. *State*, 516 P.2d 390, 395 (Alaska 1973) (bad check); *State* v. *Daley*, 189 Conn. 717, 724 (1983) (theft), or where the informant had knowledge of the modus operandi of a thief in three burglaries, but the modus operandi was known only to the perpetrator and investigating officers. *State* v. *Jones*, 96 N.M. 14, 15-16 (1981).

In situations where the description or other information obtained from the informant is likely to be known by others, the information is not accorded similar reliability. Thus in *Upton I*, 390 Mass. at 572-573, the court did not find sufficient reliability in an affidavit (reproduced in part at 564, n.2) containing the following averments. Police, on September 11, 1980, at about 12 noon, raided a motel room reserved by a Richard Kelleher and found credit cards of two persons who had reported recent thefts of a large quantity of gold and silver jewelry. At 3:20 P.M., some three hours after the beginning of the raid, an unidentified female called police, said she had seen stolen items including gold and silver jewelry in a motor home behind the home of George Upton, that Upton had purchased these stolen items from Ricky Kelleher, and that Upton was going to move the motor home because Kelleher's motel room had been raided. Although the informant knew of the police raid shortly after it had taken place, the court held the veracity prong unsatisfied. A search of the motor home was not warranted "based on a telephone tip from an anonymous informer who told a story connecting [the motor home] with the fact of a recent police search of a third person's room *on premises to which the public had access*." 390 Mass. at 573. (Emphasis supplied). The court repeated the fact of public access to the motel in *Upton II*, 394 Mass. at 378, thus laying stress on the fact that the reliability of the tip could not be inferred from the circumstance that the informant knew that a third person's motel room had been raided. The public nature of the motel prevented the informant's knowledge from being sufficiently unique to be reliable.

In the present case, too, veracity cannot be inferred from the fact that the informant knew of a recent robbery and that six guns of varying description had been stolen. "This information could indeed have been heard at a neighborhood bar, or pos-

sibly, could have been heard on a local news broadcast, or could have been read in the paper. More substantial verification is required." *People* v. *Greer*, 87 Ill. 2d 89, 94 (1981), overruled in part by *People* v. *Tisler*, 103 Ill. 2d 226, 243-246 (1984) (adopting *Gates* test) (discussing basis of knowledge prong).

c. Nor is the veracity prong significantly enhanced by the affiant's assertion that he received information from a source "whose whereabouts and identity are known to me and who wishes to remain anonymous." While the "strict requirements of reliability . . . are relaxed with respect to named and identified sources," *Commonwealth* v. *Freiberg*, 405 Mass. 282, 297, cert. denied, 493 U.S. 940 (1989), the scant description of the officer's contact with the informant "made this informant barely distinguishable from an anonymous tipster." *Commonwealth* v. *Grinkley*, 44 Mass. App. Ct. 62, 69 (1997). The affiant did not specify, nor can it be inferred, whether his knowledge of the identity of the informant was based on a telephone call or a personal meeting. "[A]nyone can claim over the telephone to be a particular individual with impunity if that claim cannot be verified." *Ibid.* See *Upton I*, 390 Mass. at 570 (informant treated as anonymous even though the officer told her over the phone that he knew who she was and the informant admitted she was that person).

In *Commonwealth* v. *Grinkley*, 44 Mass. App. Ct. at 69, despite the informant's providing the police with her name and address, she was considered to be akin to an anonymous individual as her stated identity could not be verified; she had not left a telephone number and presumably could not be reached by the police. The vague averment here that the affiant knew the identity and "whereabouts" of the informant "who wishe[d] to remain anonymous," without any indication that he knew the name of the informant and that he could readily reach him or her, suggests even greater inaccessibility than the address found insufficient in *Grinkley*. See *Commonwealth* v. *Melendez*, 407 Mass. 53, 58 n.4 (1990). See also *Commonwealth* v. *Barros*, 435 Mass. 171, 177 n.7 (2001), and the concurring opinion of Justice Sosman at 181-182 n.5.

Even where an informant is "named" and his address is given, that is but one factor to be weighed. See *Commonwealth*

v. *Atchue*, 393 Mass. 343, 347 (1984). As carefully set out in *Commonwealth* v. *Grinkley*, 44 Mass. App. Ct. at 68-69, reviewing the authorities, our cases considering the reliability of a tip strengthened when given by a named and identified informant had significant other factors supporting the informant's reliability. In *Commonwealth* v. *Welch*, 420 Mass. 646, 652 (1995), and in *Commonwealth* v. *Va Meng Joe*, 425 Mass. 99, 103-104 (1997), cases relied on by the Commonwealth, not only did the affiants identify the informants by name and address, or show they were reachable, but more importantly, the informants had accurately predicted the behavior of the respective defendants, a circumstance of "special significance when determining the reliability of an informant." *Id.* at 104. In sum, since the circumstances set forth in the affidavit were insufficient to show that the informant was credible or the information reliable, the physical evidence seized should have been suppressed.

2. *Motion to suppress statements.* We take our facts, essentially uncontested, from the motion judge's[11] findings, supplemented by uncontroverted testimony adduced at the suppression hearing. At 4:45 P.M. on January 28, 1999, escorted by an aunt or grandmother of "Ricky," see note 3, *supra*, who had let them in, four or five police officers of the Boston police department entered and secured the second floor apartment of 21 Montvale Street, Roslindale, in anticipation of the arrival of the search warrant. Detective Luis Cruz was the first officer to enter. His gun was drawn, but at his side. There were four persons in the apartment: the juvenile; Richard McMann, the son of Charlotte Cahill (the lessee of the apartment); and two others. After the four were pat frisked for weapons, preliminary inquiries revealed that two of the persons were wanted on outstanding arrest warrants. The two were arrested and taken to a police station.

The police, the juvenile, and McMann waited two and one-half hours before the officers received information that the warrant was on route. During this period, Charlotte Cahill and McMann's stepfather returned home from work.

---

[11]The judge hearing this motion was not the same judge who heard the motion to suppress the physical evidence.

While the officer awaited the warrant, McMann and the juvenile were asked to sit on the couch. Although they were not handcuffed, they were not free to leave. The juvenile was not allowed to go to the bathroom alone and was accompanied there by Detective Cruz. He was not informed that he could make a phone call, and the police did not call his mother. The parties stipulated that she was at home and that the juvenile's uncle and grandmother were also available.

At about 7:15 P.M., after receiving confirmation that the warrant was on the way, Detective Cruz and another detective began their interviews, first questioning McMann and then the juvenile. As McMann was being taken to an empty bedroom for questioning, his mother, Charlotte Cahill, approached the officers and asked whether she could be present during the interview and whether McMann should have an attorney present. Cruz responded that since McMann was an adult (he was eighteen), the choice of whether he wanted his mother present, or wanted an attorney, was up to him. McMann stated that he did not want his mother to be present during the interview. This discussion took place in front of the juvenile who was still seated on the living room sofa.

After finishing their interview with McMann, the two detectives escorted the juvenile into the bedroom. Cruz confirmed his date of birth (November 14, 1983), indicating he was fifteen years old. After reading the warnings required by *Miranda* v. *Arizona*, 384 U.S. 436, 479 (1966), Cruz asked the juvenile whether he wanted to have his mother brought to him so she could be present during the questioning or whether he wished to consult with another interested adult, suggesting that McMann's mother and two other adults were available in the kitchen. Cruz asked this question on three separate occasions, and each time the juvenile stated that he did not want to consult with an interested adult and did not want his mother present during the interview. He stated that he had been arrested twice before and that he understood his rights.[12] After waiving his rights, he admitted that he had broken into a house in West Roxbury and

---

[12]During the preliminary inquiry, after being pat frisked, the juvenile stated that he had been arrested twice before, once on a charge of robbery, and that

that five or six guns were taken and the guns were now at 21 Montvale Street.

After setting forth the foregoing facts (as supplemented), the judge found (1) that the juvenile was fifteen years old at the time of his arrest; and (2) was the subject of custodial interrogation. He made the following additional "findings" and then denied the motion to suppress the statements.

"(3) The juvenile, (name), was afforded a meaningful opportunity to consult with an adult.

"(4) The juvenile, (name), declined to have his mother or any other interested adult present during his interrogation after being repeatedly informed that he had a right to have an interested adult present.

"(5) The juvenile, (name), did knowingly and intelligently waive his Miranda Rights.

"(6) The totality of the circumstances surrounding the waiver of his Miranda Rights reveal the waiver was valid.

"(7) The waiver of his Miranda Rights [was] in no way coerced by the police."

In reviewing the motion judge's decision, we accept his subsidiary findings of fact, but make an independent determination of the correctness of his application of constitutional principles to the facts as found. *Commonwealth* v. *A Juvenile*, 389 Mass. at 135. *Commonwealth* v. *Berry*, 410 Mass. 31, 34 (1991). Not only does the Commonwealth have "a heavy burden in demonstrating that a 'defendant knowingly and intelligently waived his privilege against self-incrimination and his right to . . . counsel,'" *Commonwealth* v. *A Juvenile*, 389 Mass. at 135 (internal citations omitted), but here, "where the defendant is a juvenile, courts must proceed with 'special caution' when reviewing purported waivers of constitutional rights." *Commonwealth* v. *Berry*, 410 Mass. at 34. *Commonwealth* v. *Philip S.*, 414 Mass. 804, 808 (1993).

The leading Massachusetts case setting forth the requirements for a valid waiver of rights of a juvenile under the Fifth Amend-

he was on probation. In their briefs, both the Commonwealth and the juvenile state that he was not on probation at that time.

ment to the United States Constitution is *Commonwealth* v. *A Juvenile*, 389 Mass. 128 (1983), where at 134, the court stated:

> "[F]or the Commonwealth successfully to demonstrate a knowing and intelligent waiver by a juvenile, in most cases it should show that a parent or an interested adult was present, understood the warnings, and had the opportunity to explain his rights to the juvenile so that the juvenile understands the significance of waiver of these rights. For the purpose of obtaining the waiver, in the case of juveniles who are under the age of fourteen, we conclude that no waiver can be effective without this added protection. . . . For cases involving a juvenile who has reached the age of fourteen,[13] there should ordinarily be a meaningful consultation with the parent, interested adult, or attorney to ensure that the waiver is knowing and intelligent. For a waiver to be valid without such a consultation the circumstances should demonstrate a high degree of intelligence, experience, knowledge, or sophistication on the part of the juvenile."

Subsequent cases have instructed that it is "the juvenile's opportunity to consult that is critical, not whether he avails himself of it." *Commonwealth* v. *MacNeill*, 399 Mass. 71, 78 (1987). Such opportunity, however, must be "with an interested adult who was *informed of*, and *understood*," the constitutional rights. *Commonwealth* v. *Berry*, 410 Mass. at 35 (emphasis supplied). *Commonwealth* v. *Hogan*, 426 Mass. 424, 430 (1998). *Commonwealth* v. *McCra*, 427 Mass. 564, 567 (1998). *Commonwealth* v. *Leon L.*, 52 Mass. App. Ct. 823, 826-827 (2001).

This is a significant requirement. *Commonwealth* v. *Guyton*, 405 Mass. 497, 500-502 (1989), held that the protections required to be accorded juveniles could not be satisfied if the "advisor" (the defendant's sister) was herself a minor, thirteen days shy of her eighteenth birthday. The court noted that, even if the sister had been eighteen, the court had "serious reservations about whether the evidence presented at the suppression hearing, including [the sister's] testimony that she 'understood' the Miranda warnings, was enough to demonstrate that [the sister's] understanding was adequate to qualify her to advise the

---

[13]As indicated, the juvenile in this case was fifteen.

defendant about so crucial a question as whether he should relinquish his constitutional rights to remain silent and have counsel." *Id.* at 502 n.1.

Here, the juvenile's mother was not even made aware of her son's interrogation, let alone "informed of and made to understand" the juvenile's constitutional rights the Commonwealth claims were waived.

Implicit in *Commonwealth* v. *Berry*, 410 Mass. at 35, *Commonwealth* v. *Hogan*, 426 Mass. at 430, and *Commonwealth* v. *McCra*, 427 Mass. at 566, is the assumption that the interested adult will be present at the interrogation area if not at the interrogation itself.[14] See generally Smith, Criminal Practice and Procedure § 372 (2d. ed. 1983 & 2001 Supp.). Such presence is surely the favored practice and should be facilitated by the Commonwealth.[15] We are buttressed in this conclusion by the policy expressed in G. L. c. 119, § 67, which requires the "immediate" notification of a parent by the police "whenever a child between seven and seventeen is arrested," and authorizes the police officer in charge of the police station to "inquire into the case." By providing that "[p]ending such notice and inquiry, such child shall be detained," the statute indicates that question-

[14]See the following cases that also assume the adult's presence. *Commonwealth* v. *Ward*, 412 Mass 395, 397 (1992) (no fixed rule that a minor's opportunity to have a meaningful consultation with an interested adult requires police to inform the minor and the adult that they confer in private; it is sufficient if the police inform them of the right to confer). *Commonwealth* v. *Philip S.*, 414 Mass at 811-812 nn.5 & 6 (while investigating officials cannot force the adult to speak with the juvenile nor dictate the content of the discussion [n.6], the better practice with any juvenile is for the investigating officials explicitly to inform the juvenile's parent, or other interested adult, that an opportunity is being furnished for the two to confer about the juvenile's rights [n.5]).

[15]We note that a recent New Jersey decision, *State* v. *Presha*, 163 N.J. 304, 308 (2000), has stressed the importance of the presence of a parent or legal guardian, stating: "[C]ourts should consider the absence of a parent or legal guardian from the interrogation area as a highly significant fact when determining whether the State has demonstrated that a juvenile's waiver of rights was knowing, intelligent and voluntary . . . . Regardless of the juvenile's age, law enforcement officers must use their best efforts to locate [the parent or legal guardian] before beginning the interrogation." In order to sustain the admissibility of incriminating statements made outside of the adult's presence, prosecutors "should be required to account for those efforts to the trial court's satisfaction." *Id.* at 322.

ing should not proceed until such notification has taken place. While we have not considered whether the lengthy detention of the juvenile was in effect an arrest, we see no reason why the policy considerations of § 67 should not here apply. See *Commonwealth* v. *Wallace*, 346 Mass. 9, 17 (1963) (violation of G. L. c. 119, § 67, accompanied by lengthy questioning by police, an important factor in determining whether a confession or admission is voluntary.)

Moreover, a juvenile in trouble may be embarrassed to ask for an adult's help, and this may have been the case here, as the juvenile heard the older youth reject his mother's presence. Where, as here, the juvenile was detained for two and one-half hours in circumstances in which his mother and other close relatives were available but were not even informed of his detention, the mere asking the juvenile by the police whether he wanted his mother to be brought to him so that he might consult with her did not, we conclude, provide the juvenile with an adequate opportunity to consult.

Nor is the Commonwealth correct that its offer to let the juvenile speak with one of the adults in the apartment was sufficient. There is no basis in the record to conclude that any of the adults present in the apartment qualified as an adult who was informed of and understood the juvenile's rights. The only adult as to whom there was evidence that she was even known by the defendant was Charlotte Cahill, McMann's mother. No special relationship of the juvenile to Cahill was shown.

Our cases involving "interested adults" have all involved parents or other relatives. Indeed, in *Commonwealth* v. *McCra*, 427 Mass. at 568, the requirement was characterized as "an opportunity for a meaningful consultation with a parent, or an adult acting in loco parentis." At the very least, the adult should be someone who can be considered "interested in the defendant's welfare." See *id.* at 569.

The Commonwealth argues that even should we determine (as we have) that the juvenile did not have the opportunity to consult with an interested adult, the alternative allowed by *Commonwealth* v. *A Juvenile*, 389 Mass. at 134, applies, namely, the circumstances show the juvenile had the necessary "high

degree of intelligence, experience, knowledge or sophistication" to waive his Miranda rights.

Because of the motion judge's decision that the Commonwealth had satisfied the first alternative, the opportunity to consult with an interested adult, the judge did not discuss the second question. However, as in *Commonwealth* v. *A Juvenile*, 402 Mass. 275, 280 (1988), "the omission is not crucial here because there is no evidence in the record that would have warranted" such a finding. The only evidence the Commonwealth points to is the juvenile's statement to the police that he understood the Miranda warnings because he had been arrested twice before, once for a robbery.[16] His previous arrests standing alone do not give him the required knowledge or sophistication. See *Commonwealth* v. *Guyton*, 405 Mass. at 503, where the court stated:[17]

> "The judge's finding that . . . the defendant had 'extensive contact with the police and juvenile authorities and was well aware of his Miranda rights,' even if it were warranted by the evidence at the suppression hearing, does not satisfy [the second alternative of *Commonwealth* v. *A Juvenile*, 389 Mass. at 134]. Extensive contact with the police and other authorities by itself does not demonstrate unusual sophistication or knowledge about the Miranda rights."[18]

Proceeding with the "special caution" where a juvenile's waiver of constitutional rights is involved, see *Commonwealth* v. *Cain*, 361 Mass. 224, 228 (1972), we conclude that the motion to suppress the juvenile's statements should have been allowed.

---

[16] The Commonwealth also cites the police officers' testimony that the juvenile appeared calm.

[17] The *Guyton* court also contrasted *Commonwealth* v. *King*, 17 Mass. App. Ct. 602, 603, 610-611 (1984), a case relied on by the Commonwealth. In *King*, the defendant had been involved with the court system since the age of eleven and one-half years, and had, two weeks prior to the arrest in question, exercised his right to consult with counsel and, after consultation, had remained silent.

[18] While we do not rely on the public school records introduced in evidence as there are many reasons for poor grades, we note that they indicate that the juvenile was in eighth grade, two grades below his age level, and that he had failed numerous subjects.

In view of our conclusion that both motions to suppress were erroneously denied, the adjudications of delinquency are reversed, and the verdicts are set aside.[19] The case is remanded to the Juvenile Court for further proceedings consistent with this opinion.

*So ordered.*

---

[19]Although we do not ordinarily consider appeals from complaints which are placed on file, here we choose to do so in the interest of efficiency as the juvenile's claim that the search warrant was invalid applies also to the filed complaints. See *Commonwealth* v. *O'Brien*, 30 Mass. App. Ct. 807, 807-808 n.1 (1991), and cases cited.