Garsh, J.
The defendant, Corey Almeida (“Almeida”), is charged with trafficking in heroin in violation of G.L.c. 94C, §32E(c)(3), trafficking in cocaine in violation of G.L.c. 94C, §32E(b)(4), trafficking in heroin and cocaine in a school zone in violation of G.L.c. 94C, §32J, and conspiring with Robert Rose (“Rose”) to possess cocaine with intent to distribute in violation of G.L.c. 94C, §40. This matter is before the court on the defendant’s motions to suppress evidence seized by the police from the second floor west apartment at 69 Mill Street in New Bedford and from a Chevy Blazer as well as statements made by the defendant to the police at 69 Mill Street. For the reasons discussed below, the defendant’s motion to suppress evidence seized as the result of an illegal warrantless search is ALLOWED. The defendant’s motion to suppress evidence seized as the result of the unlawful issuance of a search warrant is DENIED with respect to evidence seized from the Chevy Blazer and is otherwise ALLOWED.
FINDINGS OF FACT
Based on all the credible evidence introduced at the evidentiary hearing and reasonable inferences drawn from that evidence, the court finds the following facts.
On July 7, 2000, Kurt Dreher (“Dreher”) was a detective in the Organized Crime Intelligence Bureau of the New Bedford Police Department. That unit specializes in narcotics investigations. Dreher was the lead investigator in a two-month investigation of Almeida. On that date, Dreher sought and obtained a search warrant for the search of “69 Mill Street, second floor east side, New Bedford, Massachusetts” and a search warrant for the search of a “2000 Chevy Blazer, *333 color red, bearing Ohio registration CHB3193." Both warrants authorize a search for controlled substances, specifically cocaine, as well as paraphernalia, records, and monies. Dreher executed the affidavit used to secure both warrants.
The affidavit contains the following information. Dreher learned from CI-1, a confidential informant, that a male by the name of Corey (also referenced as the “target”) operated a cocaine and heroin delivery service within the City of New Bedford. Cl-1 has proven reliable in the past by providing information that led to the arrest of a named individual. Cocaine, marijuana and currency was seized as a result of CI-1 providing information that led to the execution of a warrant, and the named individual has been indicted on charges stemming from the search. CI-1 told Dreher that CI-1 has been purchasing cocaine from Corey on a regular basis since May 14, 2000. A physical description of Corey was provided to Dreher by CI-1. CI-1 told Dreher that, in order to purchase cocaine from the target, CI-1 called him at a number provided to Dreher, which CI-1 believes to be the target’s cell phone. Upon speaking to the target, CI-1 informs him of the amount CI-1 wishes to purchase, a meeting place is arranged, and CI-1 goes to the location. The target arrives in a red vehicle, a Ford, bearing Massachusetts plates. CI-1 enters the target’s car and the target will sell the cocaine to CI-1. According to CI-1, the target usually has a plastic bag down the front of his pants that contains several smaller bags of cocaine and several packets of heroin. Once the target sells the cocaine, CI-1 exits the vehicle and the target drives away. CI-1 does not know where the target resides. According to the affidavit, Dreher’s independent investigation revealed that the red Ford was registered to a Corey Almeida with an address of 124 Cove Street, New Bedford. CI-1 positively identified a police file photograph of Almeida as being the person from whom CI-1 purchases cocaine. Surveillance of the target by Dreher revealed that Almeida went on occasion to 124 Cove Street but more often went to 69 Mill Street, where he entered through the side door and remained inside for long lengths of time. On numerous occasions, Dreher observed that, within minutes of the target entering the side door, the lights in the second floor east apartment went on. Within minutes of the lights in the second floor east apartment going off, the target was seen to have exited the location. On numerous occasions the target left this location, drove to locations where people were waiting for him, engaged in activity consistent with drug sales, returned to 69 Mill Street, and entered the side door, following which the lights to the second floor east apartment went back on.
The affidavit also states that Dreher had acquired information from CI-2, a first time informant and cocaine user. CI-2 told Dreher that on several occasions from June 18, 2000, CI-2 purchased cocaine from Corey Almeida. CI-2 positively identified the person in the police department’s file photograph of Almeida as the person from whom CI-2 purchases cocaine. CI-2 stated that he called the same number provided by CI-1 and then meets the target at an arranged location. The target arrives in a small red vehicle bearing the same Massachusetts registration as that provided by CI-1. CI-2 told Dreher that CI-2 knows the target keeps his stash of cocaine and heroin in the second floor east apartment at 69 Mill Street, New Bedford. CI-2 stated that CI-2 had been to this location with the target and while there observed a large quantify of cocaine and heroin.
According to the affidavit, police surveillance revealed that the defendant also drove a red Chevy Blazer bearing an Ohio registration of CHB3193, registered to Alamo Financing LP, out of Cleveland, Ohio. Dreher observed Almeida operating this vehicle while coming and going from 69 Mill Street at all hours of the day and night, and also observed Almeida in this vehicle conducting activity that appeared consistent with drug activity. Within seventy-hours before seeking the warrant, CI-1 conducted a controlled buy. Prior to meeting with the target, CI-1 was searched by Dreher and had neither currency nor contraband. Dreher handed CI-1 an amount of currency and instructed Cl-1 to call the target. Prior to placing the call to the target, James Estrella (“Estrella”), then a detective in the same unit as Dreher, located the Chevy Blazer bearing the Ohio registration parked in the driveway at 69 Mill Street. Estrella also observed the second floor east apartment lights to be on. CI-1 called the target and arranged for a delivery of cocaine. Within minutes, Estrella observed the second floor east apartment lights go off and observed the target exit from the side door to the residence and get into the Blazer. The target drove the Blazer directly to the arranged delivery location. Dreher saw CI-1 enter the vehicle and exit within minutes, walking directly to the surveillance point as the target drove off. CI-1 handed Dreher an amount of suspected cocaine, which was represented to have been just purchased from the target. When the material was field tested, the results were positive for the presence of cocaine.
CI-1 and CI-2 exist and they provided the information set forth in the affidavit. Further, on numerous occasions Dreher went to 69 Mill Street; four of those times were in the evening. He saw the target enter and leave through the side door and saw the lights in the east side apartment go on and off as the target entered and left that building. During his surveillance, Dreher never saw the lights go on in the hallway near the front door to the west side apartment. From his vantage point, he could not see whether lights in the west side apartment had gone on or off. On the occasion of the controlled buy, Estrella saw the glow from lights in the east side apartment disappear just before the target exited. Based upon his own observations, Estrella’s *334 observations, and the information provided by CI-2, Dreher concluded that the target lived or stayed in the east side apartment.
Sixty-nine Mill Street is located in a residential neighborhood in the central downtown area of New Bedford. It is a two-story building containing three apartments. Two apartments are located on the second floor. In addition to the windows of the second floor east side apartment that face Mill Street, on the west side of the front of the second floor is a window that looks into the hallway of the second floor landing.
When the police went to execute the warrant at 69 Mill Street, they believed that Almeida was operating a narcotics delivery service. They believed that he kept the contraband in the second floor east side apartment. They did not believe, and had no basis to believe, that he was selling drugs from any apartment at 69 Mill Street. They did not believe, and had no basis to believe, that he kept any contraband in any apartment other than one on the second floor east side. There is a small yard to the west of the building. The west side apartment has windows facing that yard. The building has a front entrance and an entrance on the east side where there is a driveway.
Nine to ten officers took part in the execution of the warrants for the vehicle and the second floor east side apartment. All members of the unit were in radio contact with each other. Lt. Steven Vicente (“Vicente”), the commanding officer of the narcotics unit, began surveillance of 69 Mill St. at 6 p.m. At 7 p.m., he saw the red Blazer with Ohio plates approach 69 Mill St. followed by a green car with Illinois plates. Both vehicles pulled into the driveway of 69 Mill St. Almeida exited from the Blazer, and Rose and a woman exited the other car. Vicente did not recognize either of the persons in the green car. After a brief face-to-face conversation, all three approached the rear of the dwelling.
Twenty' minutes later, Vicente saw Rose and the female leave 69 Mill St., enter their car, and drive off. He had not seen what they did inside the building. Vicente followed their car for a short distance and then, by radio, ordered one of his officers to stop it. When he did so, he had a hunch that they were involved in suspicious activity. However, he had not observed any violation of motor vehicle laws and had not seen anything in the hands of either the operator or the passenger. He did not observe any activities that fit the pattern of typical street-level drug transactions. Vicente had not observed the two remain for a suspiciously short period of time at 69 Mill St. and had not observed any suspicious interactions with the target. Neither the driver nor the passenger were known to have been involved in any past drug activities. I infer that this very experienced officer, who had been in the narcotics unit for many years and was in charge of that unit on July 7, 2000, knew very well that seeing two persons in a new car with out-of-state plates entering and remaining for twenty minutes in a building in which there was probable cause to believe narcotics were present with a person believed to operate a narcotics delivery service did not justify a stop of those persons. Vicente knew that he was operating on a hunch and that he had no legal right to order a stop of the vehicle driven by Rose for the purposes of making any inquiry. I further infer that Vicente ordered the car stopped because he hoped to develop evidence against Almeida and that he was not at all concerned with whether the stop was illegal or whether any evidence developed in the stop ultimately could be used against one or more of the persons in the vehicle being stopped. Vicente lacked an objectively reasonable suspicion of criminal activity.
The car driven by Rose was stopped per the lieutenant’s command. The officers stopping that vehicle had not seen the vehicle violate any laws and had not observed the driver or passenger engaged in any suspicious activities.
Rose was asked to exit from his car and he was patted down. Nothing was found. An officer then asked if he had anything on him that he shouldn’t have, to which Rose said “down the front of my pants." Drugs were seized from his person at that point, but Rose was not questioned further at this time. Fifty-three packets of suspected heroin and five bags of suspected cocaine along with a handgun and ammunition were seized from Rose’s vehicle. That information was communicated to fellow officers.
After following the Illinois car for a short distance, Vicente returned to his surveillance of 69 Mill St. Approximately ten minutes later, he observed Almeida exit that residence through the side door and enter the red Blazer with Ohio plates. Vicente followed the Blazer as it was being driven by Almeida. Officers stopped that car and Almeida was placed in a cruiser. Dupont advised Almeida, who was already in a cruiser, of his Miranda rights and produced the search warrant for his vehicle. Ultimately, a thorough search of the car unearthed three hundred fifty packages of suspected heroin, eleven bags of suspected crack cocaine, and nine other bags of suspected cocaine, plus over five thousand dollars of cash.
Shortly after Almeida departed from the area, Dreher, accompanied by two additional members of the narcotics unit, entered the driveway to 69 Mill Street, opened the unlocked side door, and went up the stairs. No person looking out the windows of the second floor west side apartment would have seen any of these police officers, any other police officer, or any marked police vehicle. As the officers approached the target apartment, they learned that narcotics had been seized from the red Blazer.
On the second floor were two shut doors, each leading to a separate apartment, and a doorway to the attic. The apartment doors were about two feet away from each other. Officer Dennis Ledo (“Ledo”) knocked *335 on the door leading to the east side apartment. A female voice inside said, “Corey, is that you? Just a minute. Christian just went to Walgreens and will be right back.” After a long pause, Ledo knocked again; the female asked “who is it?” Ledo’s response, “It’s the fire department,” triggered the opening of the door by the woman inside. Once she opened the door, Ledo then informed her that they were police officers and that they had a search warrant. The officers entered the apartment.
Dreher spoke with the woman, who was standing in the kitchen holding a small child. Ledo conducted a protective sweep of the apartment. The search, intended to make sure no one else was in the apartment who could destroy evidence or harm the officers, took less than a minute as the apartment was very small. The female told Dreher that her name was Lisa DeAndrade (“DeAndrade”) and provided her date of birth. None of the officers had seen her before or were familiar with her name. There is no evidence that Dreher asked her for any form of identification, and I do not so infer. In response to questioning from Dreher, DeAndrade said that Corey had just left, that he was coming back shortly, and that he was a friend of her son, Christian Montero, who was also coming back. She said that her son lived in the east side apartment. She also revealed that she knew Corey, that he was a good friend of her son, and that he was “in and out, always there.” She also told Dreher that Corey didn’t keep anything in that apartment and that he kept all his things in the west side apartment. Asked if there was anyone in that apartment, she said that she did not know.
There is no evidence that she ever provided Dreher with the basis of her knowledge that Corey did not keep anything in the east side apartment or that he kept all his things in the west side apartment. There is no indication that she represented that she had ever been in the west side apartment, that she had ever seen anyone place anything in the west side apartment, that Almeida resided in the west side apartment, or that he had told her that he kept his things there, and I do not infer that she made any of these representations. There is no indication that she represented that she herself resided in the east side apartment and I do not infer that she so represented. There is no evidence that she indicated how she was in a position to know whether Corey, who was, by her words, always in and out of the east side apartment, kept anything in the west side apartment, and I do not infer that she provided any such explanation to Dreher.
As Dreher spoke with DeAndrade, a fourth officer, Detective Robert Aguiar (“Aguiar”) entered the rear door of the east side apartment. Dreher was in the east side apartment for approximately five minutes.
Based solely upon the information provided to Dreher by DeAndrade, no search whatsoever was conducted of the east side apartment at any time. Dreher unilaterally decided to enter the west side apartment, ostensibly for the purpose of securing that apartment pending the issuance of a search warrant for that apartment. Dreher and Aguiar left the east side apartment by its front door and entered a hallway with a small landing. They approached the front door of the west side apartment located five to six feet away. Aguiar knocked on the front door to the west side apartment. When Aguiar knocked on the door, which was unlocked and lacked a door knob, handle or lock, it opened slightly. At that point the police said nothing and could hear nothing from inside the apartment. Aguiar pushed the door open the rest of the way and only then announced, “it’s the police.” There was no response. With the door fully open, neither Dreher nor Aguiar could hear any sound from inside the apartment, and they saw no person therein. They saw nothing suspicious from their vantage point outside the apartment after the door had been pushed open. The officers’ guns were not drawn, and they were not in fear for their safety.
I infer that Dreher decided that the police would enter the apartment because he expected to find something there that would support the issuance of a search warrant for the west side apartment and that the entry was not for the purposes of securing it. I infer that Dreher, at this point, suspected the veracity of CI-2, the first-time confidential informant. I further infer that Dreher believed that the woman’s statements alone would not be sufficient to persuade a magistrate to issue a search warrant for the west side apartment.[1] During the period of surveillance from 6 p.m. to 7:30 p.m., no one had been observed entering 69 Mill St. other than the defendant and the two persons who left in the Illinois registered vehicle. While the officers were in the east side apartment, they heard no noise whatsoever from the west side apartment. Dreher knew that Almeida had been taken into custody before the police entered the east side apartment and thus there was no opportunity for him to arrange the destruction of anything that might be in that apartment. The arrival of the police to the rear of the east side apartment would not have been obvious to any person inside the west side apartment. No officers were in the front entrance at that time and there were no cruisers parked in front of the building. At no point before entering into the apartment, had the officers heard a sound emanating from that apartment. After knocking on the door, which led to its being partially opened, the west side apartment could have been secured by posting an officer at the front and rear door of that apartment while an effort was made to secure a search warrant. Dreher was in radio contact with his fellow officers. There were officers available who could have been so posted.
Once Dreher and Aguiar entered the west side apartment, they stayed in the apartment for several minutes, far longer than the time necessary to ascer *336 tain that there was no one in that small apartment and to secure it. The west side apartment was the same size as the east side apartment. No one was found in the apartment. Dreher and Aguiar smelled what they believed to be acetone, a substance used to “re-rock” cocaine. While in the living room, they observed three boxes stacked on top of each other on an end table. The top box was uncovered. Dreher took the time to count twelve “brownies” in that box, namely glassine bundles of what he believed to be heroin. Dreher also observed an electronic scale with white powder and an open bar of mannite, which is used for cutting heroin, on the kitchen counter. None of the items seen in plain view were seized at this time. I infer that Dreher opened closed kitchen cabinets in search of incriminating evidence: it was in one such closed cabinet that he saw baggies and a bottle of Inositol.[2]
When Vicente arrived at the west side apartment after the defendant’s arrest, Dreher and Aguiar were exiting that apartment from the rear door. All three were present in the west side apartment when the defendant was brought into that apartment, as was Estrella. After his arrest, the defendant, who was handcuffed, was brought to the west side apartment. No one took keys from the defendant to effect an entry. No officer asked the defendant for permission to enter that apartment. Dupont entered the west apartment and remained for about a minute or two. Vicente and several other officers remained in the west side apartment with the defendant while Dreher left to return to the station to secure an additional search warrant.
Vicente advised the defendant of his Miranda rights and that the police had a search warrant for the east side apartment and were trying to get a search warrant for the west side apartment. The defendant, who was sitting on a couch in the living room, nodded. At one point, he asked Vicente if they could talk in private and nodded towards the kitchen when Vicente said, “ok.” They walked into the kitchen and Vicente asked if there was anything else in the apartment. The defendant said that it was “all in a safe,” and he pointed to a safe under the kitchen cabinet. He expressed a desire not to go to jail. Vicente advised that he was not in a position to make any promises. During the wait for Dreher to return, no search of the west side apartment was conducted.
When Dreher was preparing the affidavit to be filed in connection with the application for the west side apartment search warrant, he was aware that Dupont was conducting an interview of Rose. Dreher falsely represented in the affidavit that he had observed baggies and a bottle of Inositol in plain view while in the west side apartment. I infer that Dreher delayed final preparation of his affidavit until he had a chance to confer with Dupont about what had been learned from the interview of Rose.[3] The information supplied by Rose during his interview was incorporated into the affidavit.
Dupont interviewed Rose alone. The interview began at 8:20 p.m. and lasted about twenty minutes. Rose stated, in response to questioning, that he had purchased cocaine from a male known to him as Corey. He stated that he had followed Corey, who was operating a red Blazer, into a driveway and went with him to the second floor west apartment where he purchased a quarter ounce of cocaine. There is no evidence that the police sought to corroborate that information by speaking to the female who had accompanied Rose into the apartment building. Rose said that he was in the living room and that Almeida went to the room that abutted the living room to retrieve the drugs. He said he contacted Corey by calling his cell phone. He advised that he had purchased the gun four years earlier. Dupont also asked Rose about where he had purchased the heroin that was in his possession. Despite the fact that Rose had been found with fifty-three packets of suspected heroin and only five comer bags of suspected crack cocaine, when Rose told Dupont that he had secured the heroin “elsewhere,” there was no followup questioning. Dupont did not ask for the name of, or any identifying information about, the person from whom Rose had obtained the heroin. The primary purpose of the interview of Rose was to secure information that would incriminate Almeida and would assist in securing a search warrant for the west side apartment. All of Rose’s statements, as well as all evidence seized from Rose’s person and his vehicle, were ordered suppressed by this Court (McLaughlin, J.) on the ground that the stop of the vehicle was illegal.
There is no evidence that DeAndrade’s son Christian ever returned to the east side apartment, despite DeAndrade’s prediction that he would be “right back.”
At 9:58 p.m. and 35 seconds, Dreher re-entered the west side apartment with the warrant he had obtained authorizing a search of that apartment. He did not knock or announce his presence before entering. Dreher did not request a warrant that would have permitted a nighttime search. He showed the warrant to the defendant who was sitting on a couch in the living room. A full search of the apartment ensued shortly after 10 p.m. The search was completed after midnight. A large quantity of cocaine and heroin was retrieved from a safe, the combination to which was provided by the defendant. Over thirty “brownies" of heroin were found in the cardboard boxes in the living room. The kitchen garbage contained more empty cardboard boxes, an empty wrapper for a bar of man-nite similar to the bar found on the kitchen counter top, and an empty glassine bag. A coffee grinder commonly used by distributors to cut cocaine and heroin was found on the kitchen counter top and inside the kitchen cabinets were three open boxes of sandwich bags, one empty container of Inositol, and a self-printing kit. A dust mask of the sort used when packaging heroin was found on the television set; paperwork was located behind the couch and a *337 Movado wristwatch with a price tag of $4,990 was also seized. The warrant does not specify any wristwatch as an item authorized to be seized.
RULINGS OF LAW
The Fourth Amendment to the United States Constitution and Article 14 of the Massachusetts Declaration of Rights prohibit unreasonable searches and seizures.
Motion to Suppress Evidence Seized as a Result of a Warrantless Search
Almeida moves to suppress statements made to police following the warrantless entry of the west side apartment and to suppress evidence seized pursuant to a search warrant, the application for which relied on information obtained in a warrantless search. The Commonwealth bears the burden of proving that a warrantless entry into a dwelling was justified. Commonwealth v. Morrison, 429 Mass. 511, 515 (1999). “The right of police officers to enter into a home, for whatever purpose, represents a serious governmental intrusion into one’s privacy. It was just this sort of intrusion that the Fourth Amendment [and art. 14 were] designed to circumscribe by the general requirement of a judicial determination of probable cause.” Commonwealth v. Marquez, 434 Mass. 370, 374 (2001) (quoting Commonwealth v. Forde, 367 Mass. 798, 805 (1975)). Other than in an emergency situation, which is not relevant here, police may cross the threshold of a dwelling without a warrant only if there exists probable cause and exigent circumstances. Id. For example, where police have probable cause to believe that evidence of a crime is present inside a dwelling, they may reasonably secure that dwelling to prevent the destruction or removal of evidence while a search warrant is being sought. Commonwealth v. Martino, 412 Mass. 267, 276 (1992); Commonwealth v. Navarro, 39 Mass.App.Ct. 161, 164 (1995). Here the Commonwealth failed to prove that there was probable cause to believe that contraband was present in the west side apartment, and it failed to prove that entry into the apparently unoccupied apartment was reasonable in the circumstances.
The hunch by police that contraband would be found in the west side apartment was supported only by DeAndrade’s statement to Dreher that Almeida did not keep things at the east side apartment and that he kept his belongings at the west side apartment. Where information from an informant is relied on to supply probable cause, Article 14 requires the existence of some facts and circumstances showing both the basis of the informant’s knowledge and the reliability of her information. Commonwealth v. Cast, 407 Mass. 891, 896 (1990). Each prong must be separately satisfied, although independent police corroboration can compensate for deficiencies in either or both prongs and satisfy the probable cause requirement. Id. Here, police knew of no facts demonstrating the basis of DeAndrade’s knowledge that Almeida kept his possessions in the west side apartment. DeAndrade never stated that she observed Almeida’s possessions in the west side apartment, that Almeida resided in the west side apartment, or even that Almeida claimed to keep his possessions there. Although she stated that Almeida was a good friend of her son who spent much time in the east side apartment, she never stated that she herself resided in the east side apartment or told police how often she was there. This is not a case from which police could infer an informant’s personal knowledge of the presence of contraband. Cf. Commonwealth v. Stoute, 422 Mass. 782, 790 (1996).
Even if DeAndrade’s personal knowledge could be inferred, the Commonwealth has established neither the general veracity of DeAndrade, a first time informant, nor the specific reliability of her statements to Dreher concerning Almeida. See Commonwealth v. Parapar, 404 Mass. 319, 322 (1989). She made no statement against her penal interest. Cf. Commonwealth v. Allen, 406 Mass. 575, 579 (1990) (notingthat statement made against informant’s penal interest when police know the informant’s identity may be considered as one factor bearing on informant’s reliability). There is no evidence that DeAndrade accurately predicted the arrival of any individual since there is no evidence that her son Christian returned to the east side apartment as she had predicted he would. Further, assuming that information maybe so detailed or idiosyncratic as to be self-verifying, the sparse information furnished by DeAndrade was not enough to satisfy the veracity test. Cf. Commonwealth v. Rojas, 403 Mass. 483, 487 (1988) (explaining that a tip is not self-verifying where it did not provide “particularized distinguishing characteristics of the . . . apartment, possessions, or activities”); Commonwealth v. Alfonso A, 53 Mass.App.Ct. 279, 284 (2001) (noting that “this court has questioned the notion that detail, alone, uncorroborated by police investigation, is an indication of veracity”).
The strict requirements of reliability that govern analysis of an anonymous informant’s trustworthiness are relaxed with respect to named and identified sources. Commonwealth v. Freiberg, 405 Mass. 282, 297 (1989), cert. den., 493 U.S. 940 (1990). Victims of crime and concerned citizens who report information to the police out of civic duty are ordinarily not subject to the same degree of skepticism as confidential informants because they generally lack the ulterior motives of the latter and are presumed to be reliable.[4] Commonwealth v. Carey, 407 Mass. 528, 534 n. 4 (1990); Rojas, 403 Mass. at, 488; Commonwealth v. Grammo, 8 Mass.App.Ct. 447, 452, rev. den., 379 Mass. 926 (1979). Nonetheless, the mere fact that an informant is named does not automatically make her information reliable; rather, the fact that a person is named is simply one factor to be weighed in determining credibility. Commonwealth v. Atchue, 393 Mass. 343, 347 (1984). When dealing with a named informant, the *338 court must still consider any circumstances which bear on the likelihood of fabrication and self-interest, dangers which are generally reduced in the case of citizens whose identity can be verified by police. See Stoute, 422 Mass. at 791; Commonwealth v. Grinkley, 44 Mass.App.Ct. 62, 69, rev. den., 426 Mass. 1104 (1997); Commonwealth v. Higginbotham, 11 Mass.App.Ct. 912, 913, rev. den., 383 Mass. 891 (1981). Indeed, Massachusetts “cases considering the reliability of a tip strengthened when given by a named and identified informant had significant other factors supporting the informant’s reliability.” Alfonso A., 53 Mass.App.Ct. at 288.
Although DeAndrade identified herself and spoke to police face-to-face, she was not a concerned citizen or mere bystander providing a tip about criminal activity, thus reducing the likelihood of fabrication. See Stoute, 422 Mass. at 790-91; Commonwealth v. White, 44 Mass.App.Ct. 168, 172, rev. den., 427 Mass. 1103 (1998). Rather, she was present in her son’s apartment, for which police had a search warrant, and had every incentive to deflect suspicion to a different premise and away from herself and her son. Moreover, her statement that the defendant kept nothing in the east side apartment was inconsistent with all the other information possessed by police.
Furthermore, the nature of the officer’s contact with DeAndrade renders her information barely distinguishable from an anonymous tipster. The police sought no verification of the name which DeAndrade provided. She told the police that the east side apartment in which she was found was her son’s, not that she lived there. There is no evidence that the police sought her address or telephone number or that she provided this information. Cf. Grinkley, 44 Mass.App.Ct. at 69.
Under these circumstances, the tip was not reliable, and police or other corroboration was required. Id. at 70-71. Cf. Commonwealth v. Carrasquiello, 45 Mass.App.Ct. 772, 777 (1998), rev. den., 428 Mass. 1111 (1999) (concluding that police surveillance and controlled buy corroborated information of concerned but anonymous neighbor that drug dealing was conducted from certain apartment). Absent such corroboration, the information provided by DeAndrade did not provide probable cause to enter the west side apartment.
There was no independent police corroboration of DeAndrade’s tip prior to entry into the west side apartment. Although the police knew that Rose had been stopped and that he had cocaine and heroin in his possession when stopped, they did not yet know in which apartment it had been purchased. Police surveillance prior to the entry, as well as the information obtained from the confidential informants, did not corroborate DeAndrade’s statements. Finally, despite having a search warrant authorizing search of the east side apartment, the police chose not to conduct a search. If such a search had turned up nothing, that information might have led credence to DeAndrade’s remarks.
The Commonwealth also has failed to demonstrate the existence of exigent circumstances justifying a warrantless entry to secure the apartment pending the issuance of a warrant. Almeida was already under arrest, and the police had no information or indication suggesting that there was anyone else present in the apartment who might be alerted to the presence of police and destroy or remove the contraband sought. No reasonable belief as to the potential loss or destruction of evidence created an exigent circumstance permitting the warrant-less entry into the apartment. Cf. Martino, 412 Mass. at 276 (finding exigent circumstances where police had reason to believe that defendant’s attorney, who had entered the apartment, was preparing to remove items and the police did not have time to obtain a warrant). Nor was there any evidence suggesting that a further crime might be committed in the apartment or that police or others were in danger. See Commonwealth v. Midi, 46 Mass.App.Ct. 591, 594, rev. den., 430 Mass. 1102 (1999). When an exigency is found, the police must use the least restrictive method of intrusion. K.Smith, Criminal Practice & Procedure §172 at 147 (2002 Supp.). Had the police wanted to insure that no one would enter to destroy evidence in the west side apartment, the least restrictive intrusion would have been guarding the two entrances while waiting for a warrant to issue. Cf. Commonwealth v. Hall, 366 Mass. 790, 802-04 (1975). Not only was warrantless entry into the west side apartment illegal, but, while in the apartment, the police did not limit themselves to ascertaining that no one was present therein. “[A]ny exigency ends with the conclusion of the protective sweep.” Commonwealth v. Lewin, 407 Mass. 617, 624 (1990). Such a sweep may encompass only a cursory inspection of spaces where a person might be found. Id. at 627, n.4. Authority to secure premises does not include authority to search before the warrant is procured. Commonwealth v. Yesilciman, 406 Mass. 736, 743 (1990).
In sum, the warrantless entry by Dreher and Aguiar into the west side apartment was illegal because probable cause was lacking. It was also illegal because there were no exigent circumstances justifying such entry.
Almeida seeks to suppress, as fruit of the poisonous tree, the statements he made following his arrest while he and several police officers waited for two hours in the west side apartment for a search warrant to be obtained. The critical issue is whether Almeida’s statements were obtained by exploiting the illegal entry into the apartment or by means sufficiently distinguishable to dissipate the taint. See Commonwealth v. Fredette, 396 Mass. 455, 458-59 (1986). The facts of each case must be examined in light of several factors: the temporal proximity of the illegal conduct to the obtaining of the evidence, the presence of any intervening circumstances, the purpose and flagrancy of the police misconduct, and, in the case of statements, the giving of Miranda warnings. Fredette, 396 Mass. at 460; Commonwealth v. Manning, 44 Mass.App.Ct. 695, 698, rev. den., 427 Mass. 1108 (1998). The Commonwealth bears the *339 burden of proving that the connection between the illegal entry and the statements was so attenuated as to dissipate the taint. See Fredette, 396 Mass. at 459.
Almeida’s statements, made while awaiting the search warrant, followed fairly closely in time the illegal entry and subsequent police observation of incriminating evidence. Insofar as the statements related to the presence of contraband elsewhere in the apartment and also linked Almeida to the apartment, they were closely connected to the illegal conduct. Had the police not illegally entered into the apartment and then brought Almeida into that apartment, it is highly unlikely that he would have made the statements that he did. Further, the warrantless entry of police into the west side apartment was for the improper purpose of obtaining evidence against Almeida and not for the ostensible purpose of securing it, and it was supported by neither probable cause nor exigent circumstances. The warrantless entry, followed by the illegal search, constitutes flagrant police misconduct. No intervening circumstances dissipated the taint. The giving of Miranda warnings to the defendant in the west side apartment did not dissipate the taint. The Commonwealth has not shown that the connection between the illegal entry and the statements made by the defendant in the apartment were so attenuated as to dissipate the taint.
The defendant is entitled to suppression of the statements made at the west side apartment. Further, because the entry into the west side apartment, both in design and execution, was investigatory and undertaken in the hope that something might turn up, the observations made while inside the apartment cannot be used to justify issuance of the search warrant. Cf. Manning, 44 Mass.App.Ct. at 699 (“[i]t is well established that if the illegal arrest was for investigatory purposes, solely to acquire data regarding the defendant, the evidence should be suppressed”).
II. Motion to Suppress Evidence Seized Pursuant to a Search Warrant
Almeida first seeks to suppress all evidence seized from the Chevy Blazer on the ground that the warrant authorizing a search of vehicle was issued without probable cause. Probable cause requires more than mere suspicion but less than evidence sufficient to warrant a conviction. Commonwealth v. Hason, 387 Mass. 169, 174 (1982). In order to establish probable cause for a search warrant, the affidavit must contain enough information for the issuing magistrate to determine that the items sought are related to the criminal activity under investigation and that they may be reasonably be expected to be located in the place to be searched. Commonwealth v. Burt, 393 Mass. 703, 715 (1985). In reviewing the four corners of the warrant application, the court may consider only those facts revealed on the face of the affidavit, as well any reasonable inferences therefrom, and should read the affidavit in an ordinary, common-sense manner, without hypercritical analysis. Commonwealth v. Blake, 413 Mass. 823, 827 (1992). The defendant bears the burden of showing that evidence seized pursuant to a search warrant was illegally obtained. Commonwealth v. Taylor, 383 Mass. 272, 280 (1981).
Where a search warrant is based on information from a confidential informant, the affidavit must inform the magistrate of some of the facts and circumstances from which the informant concluded that the contraband would be where he/she claimed and some of the facts and circumstances from which the affiant concluded that the informant was credible or that the information provided was reliable. Parapar, 404 Mass. at 321. Each prong must be separately satisfied, although independent police corroboration can compensate for deficiencies in either or both prongs and satisfy the probable cause requirement. Id. at 321-22. Here, CI-1’s information, corroborated through police surveillance and a controlled buy, provided probable cause to believe that contraband would be found in the Chevy Blazer. CI-1’s purchase of cocaine from Almeida in the past establishes personal knowledge of Almeida’s activities. See Commonwealth v. Montanez, 410 Mass. 290, 300 (1991); Parapar, 404 Mass. at 322. Although CI-1 initially did not implicate the Blazer, CI-1’s participation in a controlled buy from the Blazer established a sufficient nexus between the contraband and the vehicle. See Commonwealth v. Desper, 419 Mass. 163, 168 (1994); Commonwealth v. Warren, 418 Mass. 86, 89-90 (1994). The fact that CI-1’s past information led to an arrest and seizure of contraband establishes reliability. Commonwealth v. Perez-Baez, 410 Mass. 43, 46 (1991). Information provided by CI-1 with respect to Almeida selling cocaine from a vehicle was also corroborated by CI-2, although not with respect to the Blazer. Finally, police surveillance revealed Almeida operating the Blazer, coming and going from 69 Mill Street, in connection with what police in their training and experience found to be consistent with drug activity. See Parapar, 404 Mass. at 323. Thus, the search warrant for the Chevy Blazer was supported by probable cause, and the defendant is not entitled to suppression of the evidence seized from that vehicle.
Almeida seeks, in addition, to suppress all evidence seized from the west side apartment pursuant to the search warrant. He contends that such evidence must be suppressed because the police improperly executed the warrant in the nighttime without authorization to do so. Pursuant to G.L.c. 276, §2, a search may be executed in the nighttime only if the warrant so directs. Commonwealth v. Grimshaw, 413 Mass. 73, 77 (1992). The statute embodies the important common law values of the sanctity of the home and protection of police and citizens and is designed as a safeguard against abusive, arbitrary action in carrying out a constitutionally authorized search. Id. “Nighttime,” for purposes of G.L.c. 276, §2, begins at 10:00 p.m. and ends at 6:00 a.m. Id. at 81. Here, police officers entered the west side apartment with the warrant close to 9:59 p.m. and searched until approximately midnight, thus *340 conducting the search during the nighttime without authorization to do so, contrary to the statute.
Nonetheless, the nighttime search limitation is not constitutional in nature. A violation of the express authorization requirement does not automatically result in the suppression of evidence. Id. at 77. In determining whether to suppress evidence seized without nighttime search authorization, the court considers whether, based on the facts and circumstances known to police at the time of the warrant application, there is a reasonable possibility that a request for permission to search at night would have been denied. Id. at 78. In addition, the court should consider whether the entry was made in a peaceful manner and whether the police presence was an intrusive violation on the sanctity of the home. Id. at 79. Finally, the court should consider whether suppression would deter future police misconduct. Id. (declining to suppress evidence where police could have obtained nighttime authorization if they had requested it, there was no misconduct in executing the search, and the occupants were awake and fully clothed).
In the present case, police officers entered the vacant west side apartment peacefully through an unlocked door, secured the premises, stayed, brought the defendant to the apartment, and executed the search warrant immediately after obtaining it late in the evening. No one was in the apartment when the warrant was executed apart from the defendant, and he was awake, clothed, and sitting in the living room, having been brought to the apartment following his arrest. The defendant “did not suffer the indignity of being roused from [his] sleep nor experience the fear generated by the police-state technique of the anonymous knock on the door in the dead of night.” Id. There is no reasonable possibility that permission for a night search would have been refused had the warrant application so requested. Suppression would serve no deterrent purpose. The circumstances of this case do not warrant suppression based on a violation of G.L.c. 276, §2.
Almeida also argues that the evidence found in the apartment should be suppressed because the police did not knock and announce their presence before entering when they returned with the warrant. The warrant did not contain a “no knock” authorization. The knock and announce rule serves to decrease the potential for violence, protect privacy and prevent unnecessary damage to homes. Commonwealth v. Macias, 429 Mass. 698, 700-01 (1999). It is not constitutionally required, and suppression depends on the degree to which the violation undermined the principles underlying the requirement and the extent to which exclusion will tend to deter future violations. Commonwealth v. Gomes, 408 Mass. 43, 46 (1990); Commonwealth v. Siano, 52 Mass.App.Ct. 912, 914 (2001), rev. den., 435 Mass. 1108 (2002).
Here, the entry of police without knocking and announcing their presence did not undermine the purposes behind the rule. Compliance may be excused where it would be a “useless gesture” because the person inside the dwelling to be entered has knowledge of the officers’ purpose and presence. Commonwealth v. Antwine, 417 Mass. 637, 639 (1994).
Finally, Almeida contends that affidavit failed to provide probable cause to search the west side apartment. The affidavit in support of the warrant for that apartment states that, after going to the east side apartment to execute a search warrant and speaking to a woman there, police entered the unlocked west side apartment to secure it and observed in plain view a quantity of suspected contraband and paraphernalia. Almeida contends that because police observation of these items was the result of an illegal entry into the apartment, it cannot be considered in determining probable cause for the warrant.
The mere fact that there has been an illegal entry to secure a dwelling while a search warrant is obtained does not automatically require that evidence subsequently seized in the dwelling be suppressed. There must also be a showing that the evidence sought to be suppressed is an exploitation of the prior illegality. Blake, 413 Mass. at 830. Whether the initial entry was illegal or not is irrelevant to the admissibility of the challenged evidence if there is an independent source for the warrant under which the evidence was seized, such as where none of the information on which the warrant was secured was derived from or related in any way to the initial illegal entry. See Commonwealth v. Watkins, 425 Mass. 830, 842 (1997); Blake, 413 Mass. at 830. Here Dreher impermissibly opened cabinets looking for evidence before obtaining the warrant. Obviously the false statements he made in the affidavit concerning his plain view observations of baggies and a bottle of Inositol must be excised. Further, all the genuine plain view observations and the smelling of acetone detailed in the affidavit were the direct result of the illegal entry. Although there is no requirement that an affidavit in support of a search warrant itself demonstrate that a police officer’s personal observations were made without violating the defendant’s rights guaranteed by the Fourth Amendment, observations which did so violate the defendant’s rights must be excised from the affidavit in analyzing whether it contains probable cause. Commonwealth v. D’Onofrio, 396 Mass. 711, 713 (1986).
The only remaining evidence in the affidavit that links contraband to the premises sought to be searched is Rose’s statement that he had just purchased five packets of cocaine from Almeida inside the second floor west apartment of 69 Mill Street. Rose’s identification of Almeida as the source of the cocaine is clearly based on personal knowledge. See Montanez, 410 Mass. at 300. Further, Rose’s statement, following his arrest, was an admission against penal interest which carried its own indicia of credibility. See Parapar, 404 Mass. at 322; Atchue, 393 Mass. at 348. Thus, Rose’s statement provided probable cause for a magistrate to conclude that *341 contraband would reasonably be expected to be located in the west side apartment.
Nonetheless, Almeida contends that Rose’s statement must be disregarded because it was the fruit of the illegal stop of Rose’s vehicle. When the police stopped Rose, the facts and circumstances known to them were not such that a person of reasonable caution would be warranted in believing that contraband would be found in Rose’s vehicle or on his person. Cf. Commonwealth v. Kennedy, 426 Mass. 703, 704-06 (1998) (finding probable cause where police saw a car pull up to the curb in a high crime, high drug area, and a known drug dealer approached the vehicle, spoke to the driver briefly, left for one minute, returned, reached into the vehicle while the driver reached toward him, and the vehicle then drove off). The police had not observed any suspicious transaction between Almeida and Rose and had not seen Rose engage in any suspicious activity. Rose’s accompanying a female and Almeida into a building where the defendant, a suspected drug distributor, was believed to keep his stash and Rose’s twenty minute stay in those premises are not the kinds of details that can be used to justify a stop. The fact that Rose drove a new vehicle with out-of-state plates is not a fact which changes that conclusion. Moreover, the police did not observe Rose engage in any motor vehicle violation that would warrant the stopping of his vehicle even if they also believed that the defendant was engaging in illegal drug activify. See Commonwealth v. Santana, 420 Mass. 205, 207 (1995). The question of probable cause is not a close one. Because the warrantless seizure of Rose’s vehicle was unsupported by probable cause and violated Rose’s rights under Article 14, Rose was entitled to have his statements suppressed as fruit of the poisonous tree. See Commonwealth v. Reyes, 38 Mass.App.Ct. 483, 487 (1995), aff'd., 423 Mass. 568 (1996).
The question remains whether Almeida may raise the illegality of the stop of Rose as a grounds to argue that probable cause was lacking to issue the warrant for the west side apartment. Almeida argues that he should be allowed “target standing” to challenge the use against him of evidence obtained in or as a result of a search and seizure that violated another’s rights under Article 14.[5] Massachusetts has “left open the question whether target standing has vitality under art. 14 of the Massachusetts Declaration of Rights.” Commonwealth v. Scardamaglia, 410 Mass. 375, 379 (1991) (not deciding whether to accept target standing in any circumstance because police conduct was not significantly improper). In Scardamaglia, the Court expressed a reluctance to permit target standing, thereby denying the trier of fact of potentially highly relevant evidence of guilt, because of the administrative costs to the criminal justice system of handling such claims and the perceived lack of any need to create a deterrent effect on police misconduct by the recognition of target standing “except perhaps in the case of distinctly egregious police conduct.” Id. at 380. Similarly, in Commonwealth v. Manning, 406 Mass. 425, 429-30 (1990), there was no demonstration of intentional police wrongdoing and no showing that, when the police violated the rights of another, they did so with the sole or even principal goal of obtaining incriminating evidence against the defendant. The Court pointed out that “ [unconstitutional searches of small fish intentionally undertaken in order to catch big ones may have to be discouraged by allowing the big fish, when caught, to rely on the violation of the rights of the small fish, as to whose prosecution the police are relatively indifferent." Id. at 429. See also Commonwealth v. Waters, 420 Mass. 276, 278 (1995) (concluding that police conduct was not serious, distinctly egregious misconduct that might justify granting the defendant the right (under the “target standing” theory) to challenge the allegedly unlawful search); Commonwealth v. Montes, 49 Mass.App.Ct. 789, 794-95 n. 6 (2000) (noting that Massachusetts has not explicitly adopted target standing as a matter of State constitutional law).
The facts of this case warrant granting the defendant the right, under Article 14 of the Declaration of Rights, to seek to suppress evidence seized as the result of the illegal action directed against Rose.[6] The stop of Rose’s vehicle was blatantly lacking in any justification and was ordered by the Commander because he hoped to develop information against the defendant. While at the time Vicente ordered the stop, he intended to execute the warrants for the Blazer and the east side apartment whether or not incriminating information was obtained from Rose, Vicente did not know what documentation would be found linking the defendant to east side apartment. The defendant owned an automobile registered to a different address and the only person with personal knowledge linking the defendant to the east side apartment was a confidential informant who did not want his/her identity revealed. This is not a situation in which the deterrent value of suppression would be only marginal. That Almeida and not Rose was the true target of the police is further evidenced by the fact that police showed no interest in the source of the fifty packets of heroin seized from Rose but, rather, focused on the five packets of cocaine he said that he had obtained from Almeida. The warrant application for the west side apartment was not completed until the interview of Rose was finished. Deterrence of police misconduct would be furthered by allowing standing where, as here, the unlawful conduct was intentionally directed toward the party moving to suppress.
Article 14 was adopted to prohibit the abuse of official power emanating from writs of assistance and from general warrants that gave officers unlimited discretion to search without special application to a court. “The crux of the colonists’ objection to these legal devices was the unchecked control over the liberty of the people which they vested in law enforcement officers.” Jenkins v. Chief Justice of the District Court Dep’t, 416 Mass. 221, 230 (1993). Recognition of target standing on the facts *342 of this case comports with those Massachusetts cases which have construed Article 14 as affording greater protection to the citizens of the Commonwealth than does the Fourth Amendment. E.g., Commonwealth v. Gonsalves, 429 Mass. 658, 662-63 (1999); Stoute, 422 Mass. at 789; Commonwealth v. Lyons, 409 Mass. 16, 18 (1990); Commonwealth v. Upton, 394 Mass. 363, 373 (1985). Indeed, Massachusetts has specifically declined to follow Fourth Amendment standing analysis. Commonwealth v. Amendola, 406 Mass 592 (1990) (adopting automatic standing for possessory offenses). Further, the objectively and subjectively unwarranted stop of Rose’s vehicle was not only itself egregious, it was part and parcel of a concerted effort by the police to obtain evidence against Almeida without regard to the constitutionality of their conduct. This effort included the entry into the west side apartment for the purpose of finding incriminating evidence that might support an application for a search warrant, the glaring lack of either probable cause or exigent circumstances to enter the west side apartment, the failure of the police to limit their activity, upon entry, to performing a protective sweep of the apartment, and the inclusion of a false statement in the affidavit for a search warrant as to what was observed in that apartment. This case involves both the unconstitutional search of a small fish intentionally undertaken to catch a big fish and serious, distinctly egregious misconduct.
Because Almeida is permitted to seek to suppress evidence illegally obtained from Rose, the statement by Rose that he purchased cocaine from Almeida in the west side apartment must be excised from the search warrant affidavit in analyzing whether it contains probable cause. Absent Rose’s statement, the affidavit is patently lacking in sufficient information from which a magistrate could determine that contraband would reasonably be expected to be located in the west side apartment. Accordingly, there was no probable cause for the warrant for the west side apartment, and the defendant is entitled to suppression of all evidence seized from that apartment.[7]
ORDER
For the foregoing reasons, it is hereby ORDERED that the defendant’s motion to suppress evidence as the result of an illegal warrantless search be ALLOWED and that the defendant’s motion to suppress evidence seized as the result of the unlawful issuance of a search warrant be ALLOWED insofar as it pertains to the warrant for 69 Mill Street, second floor west and be DENIED insofar as it pertains to the warrant for 2000 Chevy Blazer, color red, bearing Ohio registration CHB3193. It is further ORDERED that statements by the defendant made at 69 Mill Street, second floor west be suppressed and that all evidence seized from 69 Mill Street, second floor west be suppressed.

Indeed, when he drafted the affidavit in connection with the application for a warrant for the west side apartment, Dreher did not even bother to include the information that the female, who is unnamed in the affidavit, had provided about the defendant keeping his things in the west side apartment.

I do not credit Dreher’s testimony that he saw baggies and a bottle of Inositol in plain view on the kitchen counter. During the search after the search warrant was issued, only one bottle of Inositol was seized, and it was seized from a closed top cabinet in the kitchen. Three open boxes of baggies were found in the same cabinet. The search warrant return lists no other baggies as having been seized. During the search following the search warrant, an empty glassine bag was found in the garbage, also not in plain view.

The first three paragraphs of the two-page affidavit are identical to the affidavit filed in connection with the application for a search of the east side apartment. The two-line fourth paragraph merely states that a search warrant had been obtained for the east side apartment and the name of the target. The next paragraph describes the observations of Rose and the female, the stop of that car, and the items seized from them. Nothing in this paragraph links the defendant or drugs to the west side apartment. The next paragraph describes the stop of the target vehicle and the items seized from that vehicle as well as the fact that the east side apartment was entered and what an unnamed female in that apartment had said about the defendant being expected back shortly and that he was in and out of the east side apartment all the time. The affidavit further states that she represented that she did not know if there was anyone in the second floor west apartment. Nothing in this paragraph links the defendant or drugs to the westside apartment. The next paragraph sets forth what the affiant claims to have seen in plain view after entering the west side apartment “in order to secure it.” Finally the affidavit sets forth the information provided by Rose. That paragraph begins with the statement that the “affiant along with Det. Chris Dupont . . . went to police Headquarters to speak with the male Robert Rose . . .”

This is so even though the informant provided information during the course of an investigation and only after being interviewed by police. See Commonwealth v. Bowden, 379 Mass. 472, 477 (1980); Commonwealth v. Martin, 6 Mass.App.Ct. 624, 628 (1978).

The Supreme Court has rejected target standing under the Fourth Amendment. Rakas v. Illinois, 439 U.S. 128, 138-39 (1978).

 See Waring v. State, 670 P.2d 357 (Alaska 1983) (recognizing the state constitutional right of a defendant to suppress evidence seized from a co-defendant as a result of “gross or shocking” police misconduct or through an intentional violation of the co-defendant’s rights). But see State v. Tau’a, 49 P.3d 1227 (Haw. 2002) (holding that state constitution only protects defendants whose own rights have been violated).

Given the conclusion that all evidence seized in connection with the warrant for the west side apartment must be suppressed, it is unnecessary to decide whether the wristwatch was properly seized even though not particularly described in the warrant. Police validly executing a warrant may seize objects found in a location where the warrant entitles them to search if they come across the objects inadvertently and the objects are either of immediately incriminating character, such as contraband and fruits and instrumentalities of a crime, or police recognize them as plausibly related to criminal activity of which police were already aware. Commonwealth v. D’Amour, 428 Mass. 725, 730-31 (1999). See, e.g., United States v. Edwards, 885 F.2d 377, 390 (7th Cir. 1989) (concluding that police executing warrant in suspected drug trafficker’s apartment could seize jewelry and art objects where there is probable cause to believe that such wealth is either a direct product of illicit activity or traceable to the activity as proceeds).